1  Jerry A. Crandall (CSB No. 250192)
2  jac@crandalltech.com
   CRANDALL TECHNOLOGIES LLC
3  1590 Heavenly View Trail
   Reno, NV 89523
4  Telephone:  775.525.8777
5  Facsimile:  775.501.5157

6  *Attorney for Plaintiff*
7  *CRANDALL TECHNOLOGIES LLC*

8

9            **UNITED STATES DISTRICT COURT**

10          **SOUTHERN DISTRICT OF CALIFORNIA**

11

12  CRANDALL TECHNOLOGIES LLC,        Case No. 3:18-cv-1396-CAB-(MDD)
    a Nevada limited liability company,
13                                    **PLAINTIFF CRANDALL**
14             Plaintiff,             **TECHNOLOGIES LLC'S**
                                      **OPENING CLAIM**
15        vs.                         **CONSTRUCTION BRIEF**
16
    GREATCALL INC., a Delaware        [Patent L.R. 4.4.a]
17  corporation,
18                                    Judge:  Hon. Cathy Ann Bencivengo
              Defendant.
19                                    FAC filed:  March 4, 2019
20
                                      Initial Complaint filed:  June 25, 2018
21
22                                    Patent-in-suit:  US 8,854,789 B2

23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

# TABLE OF CONTENTS

**Page**

I.  OVERVIEW ……………………………..…………………………… 1

II.  TERMS IN DISPUTE ………………………………………………… 1

    1.  self-defense system ……………………………………………… 1

    2.  wireless transmitter ……………………………………………… 3

    3.  pressure sensor unit ……………………………………………… 4

        a.  Defendant Did Not Present Evidence Sufficient To Overcome The Presumption That The Claim Term Is Not Means-Plus-Function. ………………………………………………………5

        b.  The Claim Term Is Not Governed By Section 112, ¶6. …………..5

        c.  The Claim Term Is Not Indefinite. ……………………………  8

        d.  The Specification Contains Supporting Disclosure. …………...  8

        e.  Defendant's Proposed Construction Attempts to Import Additional Limitations Not Reflected In The Claims. ………… 9

    4.  defense event ……………………………………………….. 10

    5.  defense unit ……………………………………………………… 12

        a.  Defendant Did Not Present Evidence Sufficient To Overcome The Presumption That The Claim Term Is Not Means-Plus Function. ……………………………………………………13

        b.  The Claim Term Is Not Governed By Section 112, ¶6. …………..14

        c.  The Specification Contains Supporting Disclosure. …………... 15

    6.  comparator ……………………………………………………… 16

    7.  said comparator configured to conduct a comparison of two electronic signals and generate an execution signal based on said comparison ……………………………………………… 17

    8.  conductive energy device(s) ………………………………….. 18

        a.  Defendant Did Not Present Evidence Sufficient To Overcome The Presumption That The Claim Term Is Not Means-Plus-Function. ……………………………………………………19

        b.  The Claim Term Is Not Governed By Section 112, ¶6. …………..19

        c.  The Specification Contains Supporting Disclosure. …………... 20

      d.   Defendant's Proposed Construction Attempts to Import Additional Limitations Not Reflected In The Claims. ………… 20

9.   said comparator configured to compare said one more pressure input signals with a threshold voltage and generate an automatic execution signal in response to an absolute value or magnitude of at least one of said one or more signal amplitudes being above an absolute value or magnitude of said threshold voltage …… 21

10.  manual selector ……………………………………………………… 22

      a.   Defendant Did Not Present Evidence Sufficient To Overcome The Presumption That The Claim Term Is Not Means-Plus-Function. …………………………………………………….24

      b.   The Claim Term Is Not Governed By Section 112, ¶6. ………...24

      c.   The Specification Contains Supporting Disclosure. …………... 25

      d.   Defendant's Proposed Construction Attempts to Import Additional Limitations Not Reflected In The Claims. ………… 25

III.  CONCLUSION ……………………………………………………... 25

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                      **Page(s)**

*Am. Permahedge, Inc. v. Barcana, Inc.*,

    105 F.3d 1441 (Fed. Cir. 1997) ………………………………………… 12

*Apex v. Raritan Computer*,

    325 F.3d 1364 (Fed. Cir. 2003) …………………………………… 6, 7, 20, 24

*Apple, Inc. v. Motorola, Inc.*,

    757 F. 3d 1286 (Fed. Cir. 2014) …………………………………… 14, 24

*Application of Wertheim*,

    541 F.2d 257 (C.C.P.A. 1976) …………………………………………… 2

*Callicrate v. Wadsworth Mfg.*,

    427 F.3d 1361 (Fed. Cir. 2005) ………………………………………… 12

*Enzo Biochem, Inc., v. Applera Corp.*,

    599 F.3d 1325 (Fed. Cir. 2010) ………………………………………... 8

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,

    122 S.Ct. 1831 (2002) ……………………………………………….. 11

*Greenberg v. Ethicon Endo-Surgery, Inc.*,

    91 F.3d 1580 (Fed. Cir. 1996) …………………………………………5, 7

*Kropa v. Robie*,

    187 F.2d 150 (C.C.P.A. 1951) ………………………………………… 2

*Laitram Corp. v. Cambridge Wire Cloth Co.*,

    863 F.2d 855 (Fed. Cir. 1988) ………………………………………… 12

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*,

    520 F.3d 1367 (Fed. Cir. 2008) ……………………………………… 8, 17

*Nautilus, Inc. v. Biosig Instruments, Inc.*,

    134 S. Ct. 2120 (2014) ………………………………………………… 8

*Phillips v. AWH Corp.*,

    415 F.3d 1303 (Fed. Cir. 2005) …………………………………… *passim*

*Vitronics Corp. v. Conceptronic, Inc.*,

    90 F.3d 1576 (Fed. Cir. 1996) …………………………………….. 16

*Voda v. Cordis Corp.*,

    536 F.3d 1311 (Fed. Cir. 2008) …………………………………….. 9

*Williamson v. Citrix Online, LLC*,

    792 F.3d 1339 (Fed. Cir. 2015) …………………………… 5, 14, 19, 24

**Statutes**

35 U.S.C. § 101 ……………………………………………………7

35 U.S.C. § 112 ……………………………………………… *passim*

**Other Authorities**

Patent L.R. 4.2 ……………………………………………… 3, 4, 13

Patent L.R. 4.4 ……………………………………………….. 1

Pursuant to Patent L.R. 4.4.a and the Court's Order of November 14, 2018 [Doc. No. 17], Plaintiff Crandall Technologies LLC ("Plaintiff") hereby presents its Opening Claim Construction Brief and appended Supporting Evidence (Appendices A-G)[1] with respect to the patent-in-suit (US 8,854,789 B2), a true and correct copy of which was previously filed with the Court in Doc. No. 21-7.[2]

# I.    OVERVIEW

It is an established tenet of patent law that claims define the invention and limitations from the specification should not be imported into the claims. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc).  Defendant has repeatedly violated this principle by seeking constructions that import limitations from illustrative embodiments of the specification into the claims.  Such constructions are inconsistent with the claims' plain language and do not reflect the careful balance of using embodiments disclosed in the specification to enable one skilled in the art to practice the invention without confining the claims to those embodiments. *See id.* at 1323.  Plaintiff's constructions, on the other hand, do not import extraneous limitations and are consistent with the claims' plain language as well as being supported by the specification.  Plaintiff's constructions reflect the balance of interpreting claims in light of the specification, while avoiding importing limitations from the specification.

# II.    TERMS IN DISPUTE

## 1.    self-defense system

The term "self-defense system" means a system capable of being implemented by a user for the overall protection of life and limb, wherein such system may or may not be capable of using force in the protection of said life and limb. *See, e.g.,* Doc. No. 21-7 at 42:1:19-20 (indicating that self-defense systems

---

[1] Pages are bates stamped with designation CRAN-GREATCALLXXXXXXXX where previously served on Defendant in this action.

[2] References made by Plaintiff to specific lines of text of Doc. No. 21-7 shall follow the following format: page number(s) : column number(s) : line number(s).

may be implemented for "the overall protection of life and limb."). *See also, e.g.,* Doc. No. 21-7 at 49:16:35-50 (explaining that self-defense systems can involve "helping medical responders and law enforcement officers to locate the victim in a timely fashion … so as to render protection and medical aid") (emphasis added), thereby indicating (i) that self-defense systems may be implemented for the overall protection of life and limb (e.g., summoning emergency medical aid) and (ii) that a self-defense system itself may or may not be capable of implementing the use of force. *See also, e.g., Webster's New World Dictionary of the American Language* (2nd College Ed.) (1986) New York, NY: Prentice Hall Press, page 1292, definition of "self-defense" ("defense of oneself or of one's rights, beliefs, actions, etc."), thereby indicating that physical force is not a requisite element of self-defense.

Defendant argues that the term "self-defense system" is merely part of the claim preambles, and that this term therefore does not need to be construed. If the Court decides that this is indeed the case, then Plaintiff respectfully submits that the term "self-defense system" cannot be used during this action to in any way limit the scope of the asserted claims. *See Application of Wertheim*, 541 F.2d 257, 270 (C.C.P.A. 1976), *citing Kropa v. Robie*, 187 F.2d 150, 152 (C.C.P.A. 1951):

> [I]t appears that the preamble has been denied the effect of a limitation where the claim or count was drawn to a structure and the portion of the claim following the preamble was a self-contained description of the structure not depending for completeness upon the introductory clause * * *. In those cases, the claim or count apart from the introductory clause completely defined the subject matter, and the preamble merely stated a purpose or intended use of that subject matter.

In the event that this Court finds the term "self-defense system" to be entirely non-limiting to the scope of the asserted claims, Plaintiff shall not object.

However, Defendant next argues that, in the alternative, no interpretation is necessary and that the plain and ordinary meaning of this term should apply. This argument lacks any rational basis with respect to the applicable legal authority on

point.  The Federal Circuit has already clarified that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Phillips*, 415 F.3d at 1313.  Thus, ignoring the intrinsic evidence, which demonstrates how a particular term is used in a patent, is contrary to Federal Circuit precedent.

Here, Defendant has utterly failed (in the timely fashion required by Patent L.R. 4.2 and this Court's Case Management Order (*see* Doc. No. 17, ¶5) to provide any proposed construction supported by the intrinsic evidence of record, or any specific construction whatsoever, instead electing to vaguely propose "in the alternative" that the "plain and ordinary meaning" of this term be applied (without ever providing a proposed definition of same), all while failing to cite to even a single shred of evidence, whether intrinsic or extrinsic.  *See* Doc. No. 24-2, pages 1-7.  The Court should therefore not consider any new (and untimely) evidence or proposed constructions offered by Defendant, and Plaintiff hereby objects to any such untimely evidence/constructions.  Finally, in the event that the Court finds that the term "self-defense system" does in some way affect the scope of the asserted claims in this action, it is Plaintiff's construction, which is well-supported by both the intrinsic and extrinsic evidence of record, that should be adopted.

## 2.  wireless transmitter

The parties' agreed proposed construction of "wireless transmitter" is a device capable of wirelessly transmitting information, using a preselected wireless transmission protocol, through a wireless medium.  In the Joint Claim Construction Chart for this matter, Plaintiff has cited to both intrinsic and extrinsic evidence indicating that the parties' proposed construction of "wireless transmitter" is well-supported.  *See* Doc. No. 24-2 at pages 7-14.  Defendant nevertheless argues that this term need not be construed by the Court.  Plaintiff strongly disagrees.

Plaintiff has identified this term as one of the ten (10) most significant terms

under Patent L.R. 4.2.a.  Plaintiff respectfully requests that the Court determine its construction of this identified claim term, particularly in view of the importance of the construction of this term to the subsequent construction of the 3rd identified claim term ("pressure sensor unit").  This is particularly true here being that the claim term "pressure sensor unit" is recited in independent Claims 1 and 17 as being "integrated with a wireless transmitter" such that this integration provides a structural limitation to "pressure sensor unit", which is a claim term that Defendant is arguing is governed by 35 U.S.C. §112, ¶6.  By indicating that "pressure sensor unit" is a feature presented in a means-plus-function format, Defendant has opened the door to a judicial analysis of the ***structural context*** added to independent Claims 1 and 17 by the claim term "wireless transmitter" in view of the "integrated with" claim language.  Furthermore, as a policy consideration, Plaintiff respectfully submits that it would be unsound to simply adopt the parties' agreed proposed construction without first considering the evidence of record given the precedential affect that this Court's ruling could have on future litigation involving other parties that do not currently have a voice in the instant lawsuit.

### 3.   pressure sensor unit

The term "pressure sensor unit" is described in the specification as being a unit capable of generating a pressure input signal based on or in response to an applied pressure.  However, independent Claims 1 and 17[3] were narrowed during prosecution of the subject Application so as to recite additional structure with respect to the "pressure sensor unit".  In particular, the United States Patent and Trademark Office (USPTO) issued an Examiner's Amendment on January 16, 2014, for the subject Application wherein the language "a pressure sensor unit positioned to sense an applied pressure and generate a pressure input signal", in

---

[3] Independent Claims 3 and 21 of the subject Application (U.S. Patent Application No. 13/181,467) were renumbered by the United States Patent and Trademark Office (USPTO) as Claims 1 and 17, respectively, prior to patent issuance.

Claims 1 and 17 (emphasis added), was changed to "a pressure sensor unit integrated with a wireless transmitter, said pressure sensor unit configured to generate a pressure input signal" (emphasis added). *See* CRAN-GREATCALL00000199. As such, the claim term "pressure sensor unit" must be construed in the context of this additional claim structure, and, notably, Defendant listed this structural context when selecting this term. *See* Doc. No. 24 at page 3.

In view of this structural context, and with reference to the parties' agreed proposed construction of "wireless transmitter", the claim term "pressure sensor unit integrated with a wireless transmitter, said pressure sensor unit configured to generate a pressure input signal" means: a unit, which is capable of generating a pressure input signal based on or in response to an applied pressure, is integrated with a device capable of wirelessly transmitting information, using a preselected wireless transmission protocol, through a wireless medium.

### a. Defendant Did Not Present Evidence Sufficient To Overcome The Presumption That The Claim Term Is Not Means-Plus-Function.

In both the Joint Claim Construction Chart and Worksheet, Defendant states that the "pressure sensor unit" has a specific function and then simply alleges that no corresponding structure is disclosed. Such a conclusory allegation fails to overcome the presumption that claims which do not recite the term "means" are not subject to §112, ¶6. Indeed, a proponent of §112, ¶6 treatment of a claim devoid of "means" language must cite to evidence that overcomes the presumption. *See, e.g., Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015).

### b. The Claim Term Is Not Governed By Section 112, ¶6.

A claim term is not governed by §112, ¶6 if "the term, as the name for structure, has a reasonably well understood meaning in the art." *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996). Similar to the Federal Circuit's analysis of a "detent mechanism" in *Greenberg*, the language "pressure sensor", which is explicitly recited in the independent claims, has a reasonably well understood meaning in the art. First, Plaintiff has presented the

following dictionary definition to show that a "sensor" is a well-known device: Microsoft Computer Dictionary (5th Ed.). (2002). Redmond, WA: Microsoft Press. Page 472, the definition of "sensor": "A device that detects or measures something by converting nonelectrical energy to electrical energy."  Second, U.S. Patent Application Publication No. 2004/0264099 teaches:

> When pressure is applied to one or more of switches 103a, b, or c the circuit formed by wires 1 and 2 is closed, which in turn activates switch 146. Closing of switch 49 closes the circuit which in turn allows current to flow from the batteries B1 and B2 to the oscillator 27.

*Id.*, page 4, ¶ [0026] (emphasis added) (CRAN-GREATCALL00000454).  Third, the specification of the patent-in-suit states:

> In an embodiment, computer system 3700 optionally includes or comprises an alphanumeric input device 3760 coupled with address/data bus 3710, wherein alphanumeric input device 3760 includes or comprises alphanumeric and function keys for communicating information and command selections to processor 3720. Moreover, pursuant to one embodiment, a cursor control device 3770 is optionally coupled with address/data bus 3710, wherein optional cursor control device 3770 is configured to communicate user input information and command selections to processor 3720. For example, cursor control device 3770 may be implemented using a mouse, a track-ball, a track-pad, an optical tracking device, or a touch screen.

Doc. No. 21-7 at 53:24:1-13.  Such explicit references to an electronic keyboard, a mouse and a track-ball, each of which being commonly used to translate non-electrical, physical pressure into an electronic signal, further demonstrates that a "pressure sensor" was well-known to a person having ordinary skill in the art. Fourth, even Defendant's own dictionary definition of "sensor" makes reference to "pressure".  *See* McGraw-Hill Dictionary of Scientific and Technical Terms, Fifth Edition, McGraw-Hill, Inc., New York, New York, page 1794 (GREATCALL0000290), as referenced at Doc. No. 24-2, pages 23-24.

Plaintiff further submits that there is inherent structural meaning in a claim term that includes the word "sensor" along with an appropriate, real-world identifier (in this case, "pressure") such that the Federal Circuit precedent in *Apex v. Raritan Computer*, 325 F.3d 1364 (Fed. Cir. 2003) is applicable. *See Apex*, 325

F.3d at 1373 (holding that "the term 'circuit' with an appropriate identifier such as 'interface', 'programming', and 'logic', certainly identifies some structural meaning to one of ordinary skill in the art."). Indeed, Plaintiff wonders how a "pressure sensor unit" could possibly lack a physical structure, yet still be able to sense a pressure pressure.

Additionally, Defendant ignores the fact that the "pressure sensor unit" recited in independent Claims 1 and 17 is required to be "integrated with a wireless transmitter" and must specifically be "configured to generate a pressure input signal". These limitations indicate structure. The "wireless transmitter" is itself structural in nature, since it is a device capable of wirelessly transmitting (in the physical world) real-world signals through a wireless medium existing in the physical world. The fact that the "pressure sensor unit" is integrated with such a physical device further underscores the structural nature of this claim term, particularly in view of Figures 36B and 37, which illustrate different example embodiments involving the physical integration of a wireless transmitter. *See* "Wireless Transmitter 3680" in Doc. No. 21-7 at 40 (Figure 36B) and "Signal Generating / Receiving Unit 3750" in Doc. No. 21-7 at 41 (Figure 37).

Defendant attempts to argue that in so much as the "pressure sensor unit" has a function to perform, that it must therefore be governed by §112, ¶6.[4] Clearly, this premise runs contrary to the Federal Circuit's reasoning in *Greenberg* and *Apex*, and it also violates common sense, since constituent components of system claims in U.S. patents generally do perform specific functions such that the claimed inventions are able to achieve a "useful" result or purpose within the purview of 35 U.S.C. §101. Indeed, to hold that a claim feature is governed by

---

[4] It is telling that Defendant does not also assert that the term "wireless transmitter" is governed by §112, ¶6, even though such a device is configured to perform the *function* of wirelessly transmitting information. Indeed, Plaintiff finds Defendant's inconsistencies regarding §112, ¶6 to highlight Defendant's confusion regarding this statute.

§112, ¶6 simply because a recited component is able to perform some function would necessarily cause most every (if not every single) unexpired U.S. utility patent to be governed by §112, ¶6 (or post-AIA §112(f)).[5]  This is not the rule in the United States.  *See, e.g., Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) ("Functional language may also be employed to limit the claims without using the means-plus-function format.").

### c.  The Claim Term Is Not Indefinite.

To prove indefiniteness, the U.S. Supreme Court has held that there must be a showing that the challenged claims "read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).  The claims of the patent-in-suit, read in light of the specification, satisfy the *Nautilus* standard.  Tellingly, Defendant has proposed a construction for "pressure sensor unit".  The fact that Defendant could propose a construction for this term compels the conclusion that this term is not indefinite.  *See Enzo Biochem, Inc., v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010) ("If a claim is indefinite, the claim, by definition, cannot be construed.").

### d.  The Specification Contains Supporting Disclosure.

Even if the Court were to incorrectly conclude that the "pressure sensor unit" is governed by §112, ¶6, the element and its claim-defined structure and function are clearly supported by corresponding structure in the specification.  *See, e.g.*, Doc. No. 21-7 at 16 (Figure 13), wherein "pressure sensor unit 1210" is shown as including the "one or more pressure sensors 1310" described in Doc. No. 21-7 at 47:12:53 through 48:13:4.  *See also* Plaintiff's detailed listing of intrinsic

---

[5] This same argument also applies to Defendant's positions regarding the terms "defense unit", "conductive energy device" and "manual selector".

evidence in Doc. No. 24-2, pages 15-20.

### e. Defendant's Proposed Construction Attempts to Import Additional Limitations Not Reflected In The Claims.

Defendant's proposed construction states, "a device <u>that is in or on the material that conforms to an appendage</u>" (emphasis added).  While it is certainly telling that Defendant's proposed construction seems to underscore the physical nature of the "pressure sensor unit", such a physical integration with the "material sized to conform to an appendage" is never recited in any claim of the patent-in-suit, nor is such ever required by the specification.  Rather, Claims 1 and 17 specifically state that it is the "defense unit" that is "coupled with said material". No such physical limitation is ever recited for the "pressure sensor unit", and importing such an additional limitation is improper here at least due to the recited wireless limitations.  *See also, e.g.,* Doc. No. 21-7 at 47:12:9-22 and 47:12:45-52.

Defendant's proposed construction further states, "said device <u>contains one or more pressure sensors</u>" (emphasis added).  However, the limitation "one or more pressure sensors" is not added until dependent Claim 5, which specifically states, *inter alia*: "The self-defense system of claim 1, ***further*** comprising: <u>one or more pressure sensors</u> communicatively associated with said pressure sensor unit …." Doc. No. 21-7 at 54:25:58-60 (emphasis added).  To construe "pressure sensor unit", as recited in Claims 1 and 17, such that it must contain "one or more pressure sensors" would render the aforementioned limitation of dependent Claim 5 non-limiting as a practical matter, which would not make sense.  Indeed, as the Federal Circuit explained in *Voda v. Cordis Corp.*, 536 F.3d 1311 (Fed. Cir. 2008), "[d]ifferences among the claims can also be a useful guide in understanding the meaning of particular claim terms." *Id.* at 1320, citing *Phillips*, 415 F.3d at 1314.

Finally, Defendant's proposed construction includes the language "<u>directly transmits</u>" (emphasis added), which is also not recited in any claim of the patent-in-suit nor required by the specification.  *See, e.g.,* Doc. No. 21-7 at 52:22:66 through 53:23:9.  Plaintiff strongly objects to Defendant's multiple attempts to

improperly import additional limitations into the claims. It is Plaintiff's proposed construction, and not Defendant's, that is well-supported by the evidence of record.

### 4. defense event

The term "defense event" means an event initiated to carry out a defensive action for the overall protection of life and limb, wherein said event may or may not involve the use of force. *See, e.g.,* Doc. No. 21-7 at 42:1:19-20 (indicating that self-defense systems may be implemented for "the overall protection of life and limb."). Indeed, the specification provides that an objective of an example embodiment is to transmit information, such as "audio, image, video and/or geolocation data associated with a defense event", to a "preselected entity", "such as a local law enforcement agency **_or_** emergency medical responder." Doc. No. 21-7 at 51:19:25-28 (emphasis added). *See also, e.g.,* Doc. No. 21-7 at 49:16:35-50 (indicating that an objective of a defense event may be to help emergency medical responders to locate a user in a timely fashion such that medical aid can be rendered). Thus, it is evident from the specification that providing emergency medical responders with information that will help the medical responders to provide emergency medical assistance to a user of a self-defense system is itself an example of self-defense, as such emergency medical assistance is highly related to the overall protection of the life and limb of the user. The term "defense event" must therefore be construed in this context, wherein a defense event is not limited to the use of force against an external threat.

Indeed, the specification is replete with examples of defense events that are implemented for the overall protection of life and limb, some of which involve the use of force and some of which do not. For example, the specification states:

> [A] defense event **may** include, **_for example_**, (1) spraying a substance (e.g., a lachrymatory agent or pepper spray), (2) generating a voltage differential across two electrodes of a stun gun, (3) projecting a projectile (e.g., a rubber bullet), (4) sounding an alarm, (5) capturing information pertaining to the event, and/**_or_** (6) routing an amount of captured information to a preselected entity (e.g., a law enforcement agency).

Doc. No. 21-7 at 44:6:13-20 (emphasis added).  Sounding an alarm, capturing information pertaining to the event, and routing an amount of captured information to a preselected entity are all examples of defense events that do not involve the use of force.  As such, the specification makes it very clear that a "defense event" may or may not involve the use of force, particularly in view of the term "and/***or***" (emphasis added) in this list of examples.

The specification also makes it very clear that the term "defense event" is not limited to any of the aforementioned enumerated examples.  In particular, the specification explicitly uses the language "***may*** include" and "***for example***" (emphasis added) when listing these six (6) examples.   The specification also states, "However, <u>other defense events may also be implemented</u>".  Doc. No. 21-7 at 44:6:21 (emphasis added).  As such, the specification explicitly explains that the term "defense event" is not limited to any of the aforementioned six (6) examples.  Furthermore, the patent explicitly states:

> Although various exemplary embodiments of the present technology are described herein in a language specific to structural features and/or methodological acts, the subject matter defined in the appended claims is not necessarily limited to the specific features or acts described above. Rather, the specific features and acts described above are disclosed as exemplary forms of implementing the claims.

Doc. No. 21-7 at 54:25:22-28.  As such, the examples of defense events described in the specification are merely enabling examples, and the term "defense event" cannot now be so narrowly construed that it includes only those discrete examples, and no other possible defense events.[6]  Finally, while it is proper to construe a claim in light of the specification, courts have long recognized the canon of ***not importing*** the limitations of the specification or the preferred embodiment into a

---

[6] With respect to the application of the Doctrine of Equivalents, this is particularly true being that the term "defense event" was never added into the claim set, or in any way modified, during prosecution of the Application.  *See generally Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 122 S.Ct. 1831 (2002).

claim.  *See, e.g., Callicrate v. Wadsworth Mfg.*, 427 F.3d 1361, 1367-1368 (Fed. Cir. 2005) (reversing and remanding the district court's claim construction that unduly limited a claim term to a preferred embodiment); *Am. Permahedge, Inc. v. Barcana, Inc.*, 105 F.3d 1441, 1444 (Fed. Cir. 1997) ("Claims, not the specification embodiments, define the scope of the protection."); *Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 865 (Fed. Cir. 1988) ("References to a preferred embodiment, such as those often present in a specification, are not claim limitations.").

The Court should reject Defendant's proposed construction, which attempts to limit the claim term to six (6) examples described in the specification while adding in the language "or other events that are similar in kind".  As explained above, the construction of "defense event" cannot be limited to those examples, and the language "or other events that are similar in kind" is a transparent attempt by Defendant to inject indefinite language into the claims.  Indeed, Defendant's proposed construction would necessitate an additional Markman proceeding in order to construe the construction.  In contrast, Plaintiff's proposed construction is clear, concise, accurate and well-supported by the evidence of record.

### 5.   defense unit

The term "defense unit" is described in the specification as being a unit that is capable of initiating a defense event based on an input.  *See, e.g.,* Doc. No. 21-7 at 44:6:10-13 (with reference to Figure 1A).  Both of independent Claims 1 and 17 also require that this component be "coupled with said material".  Additionally, Claims 1 and 17 (previously numbered as Claims 3 and 21, respectively) were narrowed during prosecution of the Application so as to recite additional structure with respect to the "defense unit".  In particular, the USPTO issued an Examiner's Amendment on January 16, 2014, for the subject Application wherein the language "said defense unit integrated with a wireless receiver configured to wirelessly receive said pressure input signal from said wireless transmitter, and" was inserted

into the independent claims.  *See* CRAN-GREATCALL00000199- CRAN-GREATCALL00000200.  As such, the claim term "defense unit" must be construed in the context of this additional claim structure.  Indeed, even Defendant felt compelled to list this additional structural context when it selected and listed this claim term for construction.  *See, e.g.,* Doc. No. 24 at page 3.

That being said, Plaintiff notes that the term "defense unit" is clearly described differently in Claim 1 than it is in Claim 17.[7]  As such, ***Plaintiff objects to Defendant attempting to select different language from two (2) different claims as a single claim term for construction under Patent L.R. 4.2.a.***  In view of the different contexts recited in Claims 1 and 17, respectively, for "defense unit", Plaintiff proposes the following constructions:

 ➢ ***Claim 1:*** A unit capable of initiating a defense event is integrated with a device specifically configured to receive, using a preselected wireless transmission protocol, the information that was wirelessly transmitted by the wireless transmitter, wherein said unit is configured to cause the defense event to begin <u>based on the pressure input signal.</u>

 ➢ ***Claim 17:*** A unit capable of initiating a defense event is integrated with a device specifically configured to receive, using a preselected wireless transmission protocol, the information that was wirelessly transmitted by the wireless transmitter, wherein said unit is configured to cause the defense event to begin <u>in response to one of the pressure input signal and the manual execution signal.</u>

### a. Defendant Did Not Present Evidence Sufficient To Overcome The Presumption That The Claim Term Is Not Means-Plus-Function.

In both the Joint Claim Construction Chart and Worksheet, Defendant states that the "defense unit" has a specific function and then simply concludes that this feature is governed by §112, ¶6.  Such a conclusory allegation fails to overcome the <u>presumption</u> that claims which do not recite the term "means" are not subject to

---

[7] *See* Claim 17 ("a defense unit coupled with said material <u>and communicatively associated with said manual selector,</u> … and said defense unit configured to initiate a defense event <u>in response to either of said pressure input and manual execution signals.</u>") (emphasis added).

§112, ¶6.  *Williamson*, 792 F.3d at 1348.

### b.  The Claim Term Is Not Governed By Section 112, ¶6.

The specification describes multiple example structures for a "defense unit". *See, e.g.,* Doc. No. 21-7 at pages 6-10 (Figures 3A-7).  *See also, e.g., id.* at page 41 (Figure 37).  It would be improper to attempt to narrow the term "defense unit" to one of those example structures.  *See, e.g., Phillips*, 415 F.3d at 1323 ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

However, sufficient structure is expressly recited in the claim language.  In both of Claims 1 and 17, the "defense unit" is "configured to initiate a defense event".  In Claim 1, such an initiation is "based on said pressure input signal", wherein in Claim 17, such an initiation is "in response to either of said pressure input and manual execution signals".  While these causalities are different between the two independent claims, such expressly recited causalities cause the term "defense unit" to fall squarely within the Federal Circuit's reasoning in *Apple, Inc. v. Motorola, Inc.*, 757 F. 3d 1286 (Fed. Cir. 2014), where the court made it clear that recitation of a claim limitation's connections, functions and operation in the claim removes the limitation from §112, ¶6:

> Structure may also be provided by describing the claim limitation's operation, ***such as its input, output, or connections.*** The limitation's operation is more than just its function; it is how the function is achieved in the context of the invention.

*Apple*, 757 F. 3d at 1299 (emphasis added).

> [T]he claims do not nakedly recite heuristics without further description in the remaining claim language and specification. To the contrary, the claim language and specification disclose the heuristics' operation within the context of the invention, ***including the inputs, outputs, and how certain outputs are achieved***.

*Id.*, 757 F.3d at 1301.  While *Williamson* subsequently overruled Federal Circuit case law (including, but not limited to *Apple*) merely to the extent that such case law attempted to apply a "strong" presumption against application of §112, ¶6, an

explicit recitation in a claim of a feature's inputs, outputs and connections continues to support the conclusion that sufficient structure has been recited.

Additionally, the "defense unit" recited in independent Claims 1 and 17 (i) is physically "coupled with said material" and (ii) is required to be "integrated with a wireless receiver", which indicates structure. The "wireless receiver" is structural in nature, since it is a device capable of wirelessly receiving real-world signals through a wireless medium existing in the physical world. The fact that the "defense unit" is integrated with such a physical device (in addition to being "coupled with said material") underscores the structural nature of this claim term, particularly in view of Figures 36B and 37 of the patent-in-suit, which illustrate different example embodiments involving the physical integration of a wireless receiver. *See* "Wireless Receiver 3690" in Doc. No. 21-7 at 40 (Figure 36B) and "Signal Generating / Receiving Unit 3750" in Doc. No. 21-7 at 41 (Figure 37).

### c. The Specification Contains Supporting Disclosure.

Even if the Court were to incorrectly conclude that the "defense unit" is governed by §112, ¶6, the element and its claim-defined structure and function are clearly supported by corresponding structure in the specification. *See, e.g.*, Plaintiff's detailed listing of intrinsic evidence in Doc. No. 24-2, pages 64-73. Additionally, it is noted that a "defense event" is expressly described in the specification as an event that may include "sounding an alarm", " capturing information pertaining to the event", or "routing an amount of captured information to a preselected entity". Doc. No. 21-7 at 44:6:13-20. The specification further states, "Pursuant to one embodiment, … <u>a computer system may be implemented to carry out various operations.</u>" Doc. No. 21-7 at 53:23:13-15 (emphasis added). The specification then goes on to describe with particularity an ***example structure for such a computer system*** with reference to Figure 37. *See* Doc. No. 21-7 at 53:23:16 through 53:24:57.

### 6.  comparator

The term "comparator" means a device capable of generating an output based on a comparison.  The patent-in-suit presents a number of descriptions for a comparator.  *See, e.g.*, Doc. No. 21-7 at 42:1:52-55 ("a comparator configured to conduct a comparison of two electronic signals and generate an automatic execution signal based on the comparison").  *See also, e.g.*, Doc. No. 21-7 at 47:11:36-41 ("comparator 1010 is configured to compare the two signal amplitudes and generate execution signal 510 in response to an absolute value or magnitude of a signal amplitude of the input signal being above an absolute value or magnitude of a signal amplitude of the threshold voltage.").  The various descriptions of "comparator" in the specification are similar in that the described "comparator" is capable of generating an output signal based on a comparison.

Defendant proposes that the plain and ordinary meaning of the claim term "comparator" should apply.  Such a construction would necessarily focus upon the extrinsic evidence of record.  However, as the Federal Circuit has already made clear in *Phillips*, the claim construction analysis must start with the intrinsic evidence (the claims, the written specification, and, if appropriate, the prosecution history) rather than with the extrinsic evidence.  *See id.,* 415 F.3d at 1315-1317. *See also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[T]he specification is always highly relevant to the claim construction analysis … and … is the single best guide to the meaning of a disputed term.").

Here, not only is the term "comparator" described in the specification as a device capable of generating an output based on a comparison, but the specification also indicates that the disclosed device may or may not be hardwired to perform a specific operation.  *See, e.g.,* Doc. No. 21-7 at 53:23:11-13 ("It is noted that various components of the present technology may be hard-wired or configured to carry out various actions and operations discussed herein.").  *See also, e.g.,* Doc. No. 21-7 at 53:23:11-13, stating:

> Within the discussions herein, certain processes and steps are discussed that are realized, pursuant to one embodiment, as a series of instructions, such as a software program, that reside within computer-readable memory units and are executed by one or more processors of computer system 3700.

*See also, e.g.,* Doc. No. 21-7 at 53:23:36-38 ("In an embodiment, processor 3720 is a microprocessor or microcontroller, although other types of data processors may be implemented."). Thus, with respect to the operation of generating an output based on a comparison, the claim term "comparator" must be construed such that it includes, for example, (i) a circuit (e.g., a logic circuit) that is hard-wired to perform said operation, (ii) a microcontroller programmed to perform said operation and (iii) a microprocessor along with one or more memory units storing instructions configured to cause the microprocessor to perform said operation. Plaintiff's proposed construction of "comparator" is therefore well-supported.

In stark contrast, Defendant cites only to extrinsic evidence while ***completely ignoring*** the intrinsic evidence, even though the latter is significantly more important to the construction of a disputed term than the former. *See Phillips,* 415 F.3d at 1315-1317. Moreover, Defendant cites to different dictionary definitions while never proposing any specific construction that is supported by such extrinsic evidence. As such, while Defendant's extrinsic evidence may be considered, it is nevertheless the intrinsic evidence that must guide the Court's analysis, and Plaintiff's well-supported proposed construction should therefore be adopted.

### 7. said comparator configured to conduct a comparison of two electronic signals and generate an execution signal based on said comparison

The term "said comparator configured to conduct a comparison of two electronic signals and generate an execution signal based on said comparison", in Claim 2, means that the "comparator" is integrated into the self-defense system such that the "comparator" is configured to generate an execution signal based on the signal amplitude of an electronic signal being above an absolute value or magnitude of a threshold voltage. *See, e.g.,* Doc. No. 21-7 at 47:11:33 through

48:12:8, describing how the "comparator" is integrated into a self-defense system such that it performs this operation. *See also id.* at 17 (Figure 14) and 48:13:5-23.

Defendant once again ***ignores*** the teachings of the specification, cites only to different dictionary definitions, and never proposes any specific construction. It is Plaintiff's well-supported proposed construction that should therefore be adopted.

### 8.    conductive energy device(s)

With respect to Claim 9, the term "conductive energy device" means a device having a material capable of conducting electricity. *See, e.g.,* Doc. No. 21-7 at 49:16:6-9 ("Conductive energy device 301 is configured to generate a voltage differential between electrodes 320 ...."); *see also, e.g., id.* at 45:7:66 through 45:8:1. The specification makes it very clear that "stun guns" are merely examples of conductive energy devices. *See, e.g.,* Doc. No. 21-7 at 45:7:15-16 ("conductive energy devices (e.g., stun guns)"). The term "conductive energy device" cannot be limited to a stun gun; rather, the described structure must govern. The term "electrode[]" means a conductor of electricity. *See, e.g.,* Doc. No. 21-7 at 45:7:66 through 45:8:1. Thus, the term "conductive energy device comprising two electrodes" means a device comprising two (2) conductors of electricity.

Moreover, it is noteworthy that the specification specifically states that, "***Pursuant to one embodiment***, this voltage differential is in the range of approximately 50 to 1000 kilovolts (kV)." Doc. No. 21-7 at 49:16:9-11 (emphasis added). Therefore, the example voltage range of approximately 50 to 1000 kV is not a limitation that can now be read into the claims at issue, as this example range was presented for purposes of illustration in accordance with an example embodiment. *See also, e.g.,* CRAN-GREATCALL00000172, showing the Amendment of U.S. Patent Application No. 13/181,467 dated February 11, 2014, at page 2 (broadening dependent Claim 2 (subsequently renumbered as dependent Claim 3) such that there is ***no minimum voltage threshold*** for the generated voltage differential).

Thus, with respect to Claim 9 (emphasis added), it follows that:

> wherein said defense unit comprises:
> a conductive energy device comprising two electrodes, said conductive energy device configured to generate a voltage differential between said electrodes based on said pressure input signal

means that *the defense unit includes a device comprising two (2) conductors of electricity, wherein such device is integrated into the defense unit such that said device is configured to output a voltage between its two (2) conductors of electricity* based on the pressure input signal.  In contrast, with respect to Claim 3 (emphasis added), it follows that:

> wherein said defense unit comprises: …
> a number of conductive energy devices each comprising two electrodes and configured to generate a voltage differential between said electrodes based on said execution signal

means that *the defense unit includes one or more devices each comprising two (2) conductors of electricity, wherein each such device is integrated into the defense unit such that said device is configured to output a voltage between its two (2) conductors of electricity* based on the execution signal.

### a. Defendant Did Not Present Evidence Sufficient To Overcome The Presumption That The Claim Term Is Not Means-Plus-Function.

In both the Joint Claim Construction Chart and Worksheet, Defendant states that the "conductive energy device" has a specific function (which Plaintiff notes is overly narrow for at least the foregoing rationale) and that the term is governed by 35 U.S.C. §112, ¶6.  Such a conclusory allegation fails to overcome the presumption that claims which do not recite the term "means" are not subject to §112, ¶6.  *Williamson*, 792 F.3d at 1348.

### b. The Claim Term Is Not Governed By Section 112, ¶6.

It is telling that both Plaintiff and Defendant agree that the term "conductive energy device" is a device comprising two (2) electrodes, which is also supported by the plain language of Claim 9.  The plain language of Claim 9 further requires that the "conductive energy device" be "configured to generate a voltage

differential between said electrodes …." These limitations clearly indicate structure. Indeed, Claim 9 states (emphasis added): "said conductive energy device configured to generate a voltage differential between said electrodes <u>based on said pressure input signal</u>." Generating the subject voltage differential between the electrodes based on this specific signal connotes an integration into the self-defense system that is physical in nature, particularly where "pressure input signal 1230" is specifically described in the specification as "an electronic, electromagnetic or optical signal". *See* Doc. No. 21-7 at 47:12:28-30.

Furthermore, Plaintiff further submits that there is inherent structural meaning in a claim term that includes the word "conductive" along with an appropriate, real-world identifier (e.g., "energy"). *See, e.g., Apex,* 325 F.3d at 1373 (holding that "the term 'circuit' with an appropriate identifier such as 'interface', 'programming', and 'logic', certainly identifies some structural meaning to one of ordinary skill in the art."). Indeed, Plaintiff wonders how a "conductive energy device" could possibly lack a physical structure, yet still be able to conduct energy in the physical world, particularly where it is explicitly recited that this "conductive energy device" comprises "two electrodes".

### c.  The Specification Contains Supporting Disclosure.

Even if the Court were to incorrectly conclude that the "conductive energy device" is governed by §112, ¶6, the element and its claim-defined structure and function are clearly supported by corresponding structure in the specification. *See, e.g.*, Plaintiff's detailed listing of intrinsic evidence in Doc. No. 24-2, pages 91-93.

### d.  Defendant's Proposed Construction Attempts to Import Additional Limitations Not Reflected In The Claims.

Defendant's proposed construction of "conductive energy device" states, *inter alia*, "a device comprising two electrodes <u>connected to conductive wires</u>". Doc. No. 24-1, page 9 (emphasis added). While it is telling that Defendant's proposed construction further underscores the physical nature of the "conductive energy device", the additional limitation of "connected to conductive wires" is

never recited in any claim of the patent-in-suit, nor is such ever required by the specification.  Conductive wires 340 are disclosed in the specification with regard to an embodiment where electrodes 320 may be propelled.  *See, e.g.,* Doc. No. 21-7 at 45:8:7-17.  However, at no time does the specification limit a "conductive energy device" to this one propulsion example.  *See, e.g.,* Doc. No. 21-7 at 45:7:64 through 45:8:6, wherein conductive wires 340 are neither described nor required.

Defendant further proposes, "<u>said electrodes</u> are configured to <u>generate a voltage differential</u>" (emphasis added).  Doc. No. 24-1, page 9 (emphasis added).  However, Claim 9 specifically states (emphasis added), "<u>said conductive energy device</u> configured to <u>generate a voltage differential between said electrodes</u> …." Thus, Defendant's proposed construction is fundamentally flawed.

Defendant's proposed construction of "conductive energy device" further states, *inter alia*, "a voltage differential of <u>at least 50 kilovolts (kV)</u> …."  Doc. No. 24-1, page 9 (emphasis added).  However, the generated voltage differential is not limited to any voltage range, as previously discussed herein.

Finally, Defendant's proposed construction of "conductive energy device" further states, *inter alia*, "in order to <u>momentarily stun or disable an attacker</u>." Doc. No. 24-1, page 9 (emphasis added).  Defendant is attempting to improperly limit the term "conductive energy device" based on example functionality described in the specification rather than focusing on the described structure.

**9.  said comparator configured to compare said one more pressure input signals with a threshold voltage and generate an automatic execution signal in response to an absolute value or magnitude of at least one of said one or more signal amplitudes being above an absolute value or magnitude of said threshold voltage**

The term "said comparator configured to compare said one more pressure input signals with a threshold voltage and generate an automatic execution signal in response to an absolute value or magnitude of at least one of said one or more signal amplitudes being above an absolute value or magnitude of said threshold voltage", in Claim 5, means that the "comparator" is integrated into the self-

defense system such that the "comparator" is configured to output a signal based on a signal amplitude of at least one signal output by one or more pressure sensors of the self-defense system being above an absolute value or magnitude of a preselected voltage magnitude or intensity. *See, e.g.,* Doc. No. 21-7 at 17 (Figure 14) and at 48:13:5-23. *See also id.* at 47:11:33 through 48:12:8.

Defendant once again ***ignores*** the teachings of the specification, cites only to different dictionary definitions, and never proposes any specific construction. It is Plaintiff's well-supported proposed construction that should therefore be adopted.

### 10. manual selector

The term "manual selector" means a device or component integrated into the self-defense system such that this device or component is configured to output a signal based on or in response to a manual selection of said device or component. *See, e.g.,* Doc. No. 21-7 at 48:14:44-59. Indeed, the specification describes this term as "a manual selector 1910 coupled or associated with defense unit 140 and positioned to generate a manual execution signal 1920 in response to a selection 1930 of manual selector 1910." Doc. No. 21-7 at 48:14:49-52.

Defendant attempts to narrow the construction of "manual selector" to a single example structure described in the specification. In particular, Defendant references the structure described with respect to Figures 21A and 21B of the patent-in-suit, which involves "digit receptacle 2110" and "selection mechanism 2130". *See* Doc. No. 21-7 at 49:15:30-67. However, this structure is merely an example of a "manual selector". *See, e.g.,* Doc. No. 21-7 at 49:15:30-32 ("With reference now to FIGS. 21A and 21B, an <u>exemplary</u> manual selector 2100 in accordance with ***an*** <u>embodiment</u> is shown.") (emphasis added).

The specification also describes other structures that may be implemented as a "manual selector". For example, the specification states, "Pursuant to one embodiment, … a computer system may be implemented to carry out various operations." Doc. No. 21-7 at 53:23:13-15. The specification further states:

pursuant to one embodiment, a ***cursor control device 3770*** is optionally coupled with address/data bus 3710, wherein optional cursor control device 3770 is configured to <u>communicate user input information and command selections</u> to processor 3720. For example, cursor control device 3770 may be implemented using <u>a mouse, a track-ball, a track-pad, an optical tracking device, or a ***touch screen***</u>. In a second example, a cursor is directed and/or activated in response to input from ***alphanumeric input device 3760***, such as when <u>special keys</u> or <u>key sequence commands</u> are executed. It is noted, however, that a cursor may be directed by other means, such as, for example, <u>voice commands</u>.

Doc. No. 21-7 at 53:24:6-18 (emphasis added). Therefore, there are clear disclosures in the specification of a number of example devices that can be implemented as a "manual selector". As a result, the term "manual selector" cannot be so narrowly construed that these example manual selectors (e.g., a touch screen) are excluded from the construction of this claim term. *See, e.g., Phillips*, 415 F.3d at 1323 ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). To avoid importing limitations from the specification into the claims, the Federal Circuit noted in *Phillips* that that the purpose of the specification is to teach and enable those skilled in the art to make and use the invention and to provide a best mode for doing so, not to necessarily restrict the invention to specific examples provided in the specification. *Id.*

Finally, it is noteworthy that the specification expressly states:

Although various exemplary embodiments of the present technology are described herein in a language specific to structural features and/or methodological acts, <u>the subject matter defined in the appended claims is not necessarily limited to the specific features or acts described above.</u> Rather, the specific features and acts described above are disclosed as exemplary forms of implementing the claims.

Doc. No. 21-7 at 54:25:22-28 (emphasis added). This clear qualification further demonstrates that Defendant's proposed construction (which attempts to limit the term "manual selector" to a single example structure while ignoring other technical disclosures) is entirely unsupported by the intrinsic evidence of record. It is

Plaintiff's well-supported construction that must therefore be adopted.

### a. Defendant Did Not Present Evidence Sufficient To Overcome The Presumption That The Claim Term Is Not Means-Plus-Function.

In both the Joint Claim Construction Chart and Worksheet, Defendant states that the "manual selector" has a specific function and that the term is governed by 35 U.S.C. §112, ¶6.  Such a conclusory allegation fails to overcome the presumption that claims which do not recite the term "means" are not subject to §112, ¶6.  *Williamson*, 792 F.3d at 1348.

### b. The Claim Term Is Not Governed By Section 112, ¶6.

As previously discussed, the specification discloses multiple possible structures for a manual selector.  Also, there is inherent structural meaning in a claim term that includes the word "selector" along with an appropriate, real-world identifier (e.g., "manual").  *See, e.g., Apex*, 325 F.3d at 1373 (Fed. Cir. 2003).

Also, the "manual selector", in addition to being "communicatively associated with said defense unit" in Claim 8, is "configured to generate a manual execution signal" in both of Claims 8 and 17.  Claim 8 further states (emphasis added): "said defense unit configured to initiate said defense event based on said manual execution signal."[8]  The claim therefore defines a connectivity between the "manual selector" and the "defense unit", which itself is probative of further structure in view of the Federal Circuit's rationale in *Apple*:

> Structure may also be provided by describing the claim limitation's operation, ***such as its input, output, or connections.***  The limitation's operation is more than just its function; it is how the function is achieved in the context of the invention.

*Apple*, 757 F. 3d at 1299 (emphasis added).

> [T]he claims do not nakedly recite heuristics without further description in the remaining claim language and specification. To the contrary, the claim language and specification disclose the heuristics' operation within the context of the invention, ***including the inputs, outputs, and how certain outputs are achieved***.

---

[8] Claim 17 uses different causal language, but this same rationale still applies.

*Id.*, 757 F.3d at 1301.  Plaintiff respectfully submits that such explicit connectivity is particularly useful in demonstrating that sufficient structure has been recited in a claim when the specification discloses multiple alternative structures, particularly in view of the Federal Circuit's warning in *Phillips* against confining claims to one of multiple specific embodiments.  *See, e.g., Phillips*, 415 F.3d at 1323.

### c.  The Specification Contains Supporting Disclosure.

Even if the Court were to incorrectly conclude that the "manual selector" is governed by §112, ¶6, the element and its claim-defined structure and function are clearly supported by corresponding structure in the specification.  *See, e.g.,* Plaintiff's detailed listing of intrinsic evidence in Doc. No. 24-2, pages 103-107.

### d.  Defendant's Proposed Construction Attempts to Import Additional Limitations Not Reflected In The Claims.

Defendant's entire proposed construction of "manual selector" constitutes an attempt to improperly import additional limitations into Claims 8 and 17.  While it is telling that Defendant's proposed construction further underscores the physical nature of the "manual selector", the additional limitations of "[o]n the material that conforms to a hand", "a digit receptacle having a width or diameter based on a preselected digit width or diameter" and "that digit receptacle contains a button or similar depression mechanism" is never recited in any claim of the patent-in-suit, nor is such ever required by the specification, as previously explained.  Indeed, Defendant even goes so far as to attempt to limit the term "appendage" to a hand, even though the specification explicitly states, "the term 'appendage' may be construed as being, for example, an arm, hand, finger, thumb, leg, foot, toe, or any other physical appendage" (Doc. No. 21-7 at 43:4:23-25), which further demonstrates that departure of Defendant's proposed constructions from the teachings of the specification.

## III.  CONCLUSION

For at least the foregoing reasons, it is hereby respectfully requested that the Court adopt Plaintiff's well-supported claim constructions.

Date: April 16, 2019                     By:     s/ Jerry A. Crandall

                                                 Jerry A. Crandall (CSB No. 250192)
                                                 jac@crandalltech.com
                                                 CRANDALL TECHNOLOGIES LLC
                                                 1590 Heavenly View Trail
                                                 Reno, NV 89523

                                                 *Attorney for Plaintiff*
                                                 *Crandall Technologies LLC*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 16, 2019, the foregoing document and all accompanying attachments were filed with the Clerk of the U.S. District Court for the Southern District of California, using the Court's Electronic Case Filing (ECF) system, in compliance with CivL.R. 5.4.  The ECF system serves a "Notice of Electronic Filing" to all parties and counsel who have appeared in this action and who have consented under CivL.R. 5.4 to accept that Notice as service of this document.

Date: April 16, 2019                    By:    s/ Jerry A. Crandall

Jerry A. Crandall (CSB No. 250192)
jac@crandalltech.com
CRANDALL TECHNOLOGIES LLC
1590 Heavenly View Trail
Reno, NV 89523

*Attorney for Plaintiff*
*Crandall Technologies LLC*