KILPATRICK TOWNSEND & STOCKTON LLP
MEGAN M. CHUNG (State Bar No. 232044)
mchung@kilpatricktownsend.com
JAMES J. MAUNE (State Bar No. 293923)
jmaune@kilpatricktownsend.com
12255 El Camino Real, Suite 250
San Diego, CA  92130
Telephone:858 350 6100
Facsimile: 858 350 6111

KILPATRICK TOWNSEND & STOCKTON LLP
WILLIAM E. MOSLEY (State Bar No. 280495)
wmosley@kilpatricktownsend.com
1080 Marsh Road
Menlo Park, CA 94025
Telephone: (650) 326-2400
Facsimile: (650) 326-2422

Attorneys for Defendant
GREATCALL INC.

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRANDALL TECHNOLOGIES LLC, a Nevada Limited Liability Company,<br><br>Plaintiff,<br><br>v.<br><br>GREATCALL INC., a Delaware Corporation,<br><br>Defendant. | Civil Action No. 3:18-cv-01396-CAB-MDD<br><br>**RESPONSIVE CLAIM CONSTRUCTION BRIEF**<br><br>Hearing Date:    May 23, 2019<br>Judge:   Hon. Cathy Ann Bencivengo<br>Courtroom:      4C, 4th Floor |



Plaintiff Crandall Technologies LLC's ("Plaintiff" or "Crandall") opening claim construction brief (Dkt. No. 31) confirms its misunderstanding of *Williamson*. Further, Plaintiff's proposed constructions are flawed, not only because they again implicate Section 112(6) by relying on generic placeholder plus function language, but because they add further ambiguity and are inconsistent with or unsupported by the intrinsic record in their over-breadth. Accordingly, they should be rejected and GreatCall's proposed constructions should be adopted instead.

### A.   PRESSURE SENSOR UNIT (SECTION 112(6) TERM)

As a preliminary matter, Plaintiff misunderstands Section 112(6) as exemplified by its comment: "Indeed, Plaintiff wonders how a 'pressure sensor unit' could possibly lack a physical structure, yet still be able to sense a pressure[.]" Dkt. No. 31, at 7. Of course, the issue is not whether a "pressure sensor unit" is a physical versus *non-physical* structure; the issue is whether the term on its own *sufficiently identifies the structure to which it refers* for performing the function. *See, e.g.*, *TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259-60 (Fed. Cir. 2008); *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015).

The term here to be construed is "pressure sensor unit" and ***not*** "pressure sensor" as Plaintiff suggests for the first time. Dkt. No. 24, at 3. The two terms are not the same. Claim 5, which depends on claim 1, uses both of these terms. *See* '789 Patent, Claim 5 ("one or more ***pressure sensors*** communicatively associated with said ***pressure sensor unit***, each of said one or more pressure sensors configured to sense an applied pressure….") (emphasis added). The doctrine of claim differentiation requires the two terms to have separate and distinct meanings (whatever they may be). *See Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999) (the doctrine of claim differentiation reflects "the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.").

As explained in GreatCall's opening brief, "pressure sensor unit" is a term



that does not imply any structure.  Dkt. No. 30 at 7.  In contrast, the terms "detent mechanism" and "circuit," which Plaintiff relies upon, have been found to denote known structure.  *See Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996); *Apex v. Raritan Computer*, 325 F.3d 1364, 1373 (Fed. Cir. 2003).  Dkt. No. 31, at 5.  Moreover, MPEP § 2181 provides that "unit" is indeed frequently a non-structural generic placeholder, unlike "détente mechanism."

Both claims 1 and 17 require the "pressure sensor unit" at minimum to be "configured to generate a pressure input signal."  Yet, the claims do not identify any structure that accomplishes generation of "pressure input signal" which the parties agreed to mean "electronic, electromagnetic, or optical signal generated based on or in response to an applied pressure" (Dkt. 24-1 at 2).  Contrary to Plaintiff's argument, "pressure sensor" provides no structure on how "pressure input signal" is generated, let alone how it accomplishes Plaintiff's proposed construction of "a unit" for performing multiple functions of wirelessly transmitting information and generating a "pressure input signal."

For the first time in its Opening Brief, Plaintiff argues that "pressure sensor unit" should be somehow equated with a "pressure sensor."  Plaintiff's argument should be rejected.  First, these are different terms and thus should be accorded different meaning.  Second, the '789 Patent describes the "pressure sensor unit" as capable of more than just "sensing pressure." Dkt. 30 at 8.  Third, Plaintiff suggests that somehow "pressure sensor unit" can equate to a "sensor" that senses "pressure" in citing to three different sources: (1) the Microsoft dictionary definition of "sensor": "a device that detects or measures something by converting nonelectrical energy to electrical energy"; (2) an *unrelated* U.S. Patent Publication No. 2004/0264099, disclosing "When pressure is applied to one or more switches 103a, b, or c, the circuit formed by wires 1 and 2 is closed"; and (3) the '789 Patent, at Col. 24:1-13, discussing a computer system and electronic keyboard, a mouse and a

track ball (Dkt. No. 31 at 11).[1]  These sources, however, only emphasize that there is no commonly understood structure or even a class of structure.  Indeed, the McGraw-Hill Dictionary of Scientific and Technical Terms define "sensor" as a "*generic* name for a device that senses either the absolute value or a change in a physical quantity such as temperature, pressure, flow rate, or pH, or the intensity of light, sound, or radio waves . . . ." Dkt. 24-2 at 23-24 (italics added); *see also* https://en.wikipedia.org/wiki/Pressure_sensor (describing different types of sensors for measuring different pressures); *see also* Declaration of William E. Mosley, Exs. A and B.  Hence, there are a wide variety of different types of structures that may be considered "sensors," and yet there is no sufficient detail in the claim language or in the specification to identify the specific structure claimed.

Plaintiff's reliance on the prosecution history is also misplaced.  Plaintiff merely cites to amendments to the surrounding language of claims that also contain the term "pressure sensor unit."  Dkt. No. 31 at 4-5.  Those amendments, however, do not clarify what the disputed term "pressure sensor unit" means or what structure actually accomplishes the function(s) in the first instance.

Because Section 112(6) applies and no structure is even disclosed in the specification, that "pressure sensor unit" is indefinite as explained in GreatCall's Opening Brief.  Plaintiff asserts that "[t]he claims of the patent-in-suit, read in light of the specification, satisfy the *Nautilus* standard." Dkt. No. 31 at 8.  But Plaintiff does not identify *any* specific structure that corresponds to a "pressure sensor unit," and thus *Nautilus* standard is not met.  Plaintiff further argues that Defendant could not offer an alternative construction if the term is indefinite.  However, the mere fact that one or the other party is *capable of proposing a construction* is not an argument

---

[1] Plaintiff does not suggest that these computer accessories can generate pressure input signal.  Also, it is unclear how the "self-defense system" includes these computer accessories and system when people do not normally carry these type of devices for "self-defense" in case they are attacked (the overarching scenario described in the patent).  *See, e.g.*, '789 Pat. at 5:1-19, 7:28-36.



- 3 -

1    against indefiniteness.  *See, e.g.*, *Cal. Inst. Of Tech. v. Hughes Commc'ns Inc.*, 35 F.

2    Supp. 3d 1176, 1190 fn. 7 (C.D. Cal. 2014) ("The fact that attorneys in litigation

3    propose multiple constructions has no effect on whether a claim, read in the context

4    of the specification and prosecution history, is sufficiently definite.").

5         Lastly, Plaintiff's criticisms of GreatCall's proposed alternative constructions

6    are flawed.  Plaintiff contends GreatCall should not include "one or more pressure

7    sensors" in the "pressure sensor unit" because it later appears in claim 5.  The

8    specification, however, shows that "pressure sensor unit" includes one or more

9    "pressure sensors" and it does not identify any other structure for sensing pressure.

10   Similarly, while Plaintiff objects to the "pressure sensor unit" directly transmitting

11   pressure input signal, it cannot identify any other structure that can transmit the

12   pressure input signal from the specification.  Again, Plaintiff's objection of the

13   "pressure sensor unit" being in or on the material is misplaced when Plaintiff's cited

14   passage confirms that the pressure sensor unit is on the material: "The physical

15   pressure (e.g., applied pressure 1220) *applied* by the attacker *to the material 120* is

16   sensed by *pressure sensor unit* 1210." '789 Pat. At 12:24-27 (emphasis added).

17   Moreover, while the specification describes how a "*pressure sensor*" may be

18   positioned at different locations on the body, it does not state that the sensor is not

19   on the material. '789 Patent at 12:50-52.  In contrast, the location of the "pressure

20   sensor unit" is clearly described and shown on or in the material.[2]  Dkt. 30 at 9.

21   **B.    "Defense Unit" (Section 112(6) Term)**

22        As a preliminary matter, Plaintiff's "objection" to GreatCall's proposal to

23   construe the term "defense unit" due to differences in the relevant claims has no

24   merit. The term "defense unit" cannot have two separate constructions.  The word

25   "unit," as discussed above and in GreatCall's Opening Brief, is a generic

26   placeholder and the word "defense" has no structural meaning. Dkt. 30 at 11-12. In

27   fact, Plaintiff concedes that there is no common understanding to a person of

28

---

[2] Plaintiff's citation to Cols. 22:66-23:9 does not appear relevant to the issue.



GREATCALL'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
CASE NO. 3:18-CV-01396-CAB-MDD

ordinary skill in the art for "defense unit" by having to refer to the specification of the patent-in-suit.  Dkt. 31 at 12-13.  Moreover, again Plaintiff's argument that the claim language identifies specific functions or relationships with other components, such as wireless transmitter, does not actually show a definite structure for "defense unit."  *See id.* at 14-15.  Further, Plaintiff proposes a construction—"a unit capable of initiating a defense event, wherein said unit is configured to cause the defense event…"—only confirms that "defense unit" does not connote sufficient structure and is only being interpreted through functional language.

As with its reliance on *Greenberg* and *Apex*, Plaintiff's reliance on *Apple Inc. v. Motorola, Inc.* (a decision the Federal Circuit overruled in *Williamson*) does not aid its cause.  The disputed term "heuristic" in *Apple* had a generally understood meaning that could supply requisite structure.  757 F.3d 1286, 1301 (Fed. Cir. 2014).  Missing here, in contrast to *Apple*, is any support in the intrinsic or extrinsic record for the notion that "defense unit" has a known meaning to those of skill in the relevant field of endeavor, rendering *Apple* inapposite to the matter at hand.

## C.   "Conductive Energy Device" (Section 112(6) Term)

Once more, Plaintiff complains that "conductive energy device" is not subject to Section 112(6) by reviewing the specification to find structure.  As explained in GreatCall's opening brief, "device" is another generic placeholder and "conductive energy" does not connote sufficient structure.  Dkt. 30 at 13.  Plaintiff's reliance on *Apex* (Dkt. No. 31 at 20) is misplaced as explained above.  Moreover, Plaintiff's proposed constructions confirm that Plaintiff interprets "conductive energy device" to mean a device that has certain functional capabilities.  Plaintiff appears to change its proposed construction in its Opening Brief: "'conductive energy device' means a device having a material capable of conducting electricity" (Dkt. 31 at 18).  This proposal connotes no sufficient structure or even clear scope, as even the human body can conduct electricity.  Plaintiff's earlier proposed construction fares no better: "The defense unit includes one or more *devices* each comprising two (2)



*conductors of electricity*…said device is *configured to output a voltage* between its two (2) conductors of electricity based on execution signal." Both proposals define "conductive energy device" based on function, and thus Section 112(6) applies.

Plaintiff curiously notes that "[i]t is telling that both Plaintiff and Defendant agree that the term 'conductive energy device'" comprises two electrodes. Dkt. No. 31, at 19. However, neither of Plaintiff's proposed constructions include "electrodes."[3] If both parties' proposals include electrodes, then this should be adopted since the specification describes the "conductive energy device" as including two electrodes. Dkt. No. 30 at 13-15.

Lastly, Plaintiff's ever-changing proposals for "conductive energy device" should be rejected. Not only do the proposed constructions ignore the requirements of Section 112(6), they are overly broad that they are not supported by the specification. First, the specification does not provide examples of the "conductive energy device" to mean *any material* capable of conducting electricity. Rather, the specification is explicit about at least two electrodes such that the voltage differential between the electrodes can disable an attacker. *See* '789 Pat., cols 7:11-18; 7:66-8:6; 8:7-17; 9:46-57; 11:24-32; 16:1-11; Figs. 3B, 6. Second, Plaintiff's earlier proposal with "conductors" outputting any voltage is also overbroad in contravention to the specification that requires, as described above, electrodes and minimum voltage of 50kV. These constructions cannot stand.

**D.    "Manual Selector" (Section 112(6) Term)**

As explained above, Plaintiff's arguments regarding *Apex* and *Apple*, identifying functions from claims, and supposed importing limitations should be rejected. Plaintiff again intimates that "computer system [that] may be implemented to carry out various operations", keyboard, mouse or touch screen constitute

---

[3] At this point, it is unclear what exactly is Plaintiff's proposed construction. While GreatCall rebuts Plaintiff's arguments, it reserves the right to address any questions or to strike Plaintiff's ever-changing interpretations.



GREATCALL'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
CASE NO. 3:18-CV-01396-CAB-MDD

somehow disclosure of the "manual selector." Dkt. 31 at 22-23. However, those structures are not disclosed in claims 8 and 17 that require "manual selector" and that Plaintiff's cited passages from the specification do not mention a "manual selector" *even once*.[4] Moreover, this so-called structure does not "generate a manual execution signal" required in claims 8 and 17 when the specification clearly distinguishes "manual execution signal" from "automatic execution signal" ('789 Pat., Col. 13:21-23). Rather, the only structure described for "generat[ing] a manual execution signal" is the button depicted in Figs. 21A and 21B.

Plaintiff does not actually offer a construction for "manual selector" in which these computer devices are incorporated. Plaintiff proposes "a device or component is integrated in the self-defense system such that this device or component is configured to output a signal based on or in response to a manual section of said device or component." First, Plaintiff's proposed construction merely describes the function to be performed by the manual selector without clarifying what a "manual selector" is in the first place; it should be rejected. Second, Plaintiff's proposal contradicts intrinsic record, which require at minimum that it outputs a "manual execution signal" and not just any and all signals. '789 Pat. Claims 8 and 17; 14:49-52; 15:30-40. Also, the specification describes only one embodiment as "manual selector" and does not identify any other types of devices or components as such. Accordingly, Plaintiff's proposal should be rejected and GreatCall's proposal— soundly rooted in the requirements of Section 112(6)—should be adopted instead.

### E.    "Defense Event"

Plaintiff's proposed construction for "defense event" as "an event to carry out a defensive action for the overall protection of life and limb, wherein said event may or may not involve the use of force" provides no clarity as to the scope of this term

---

[4] If Plaintiff truly contends that the referenced "computer system" is or includes a "manual selector," then the lack of disclosure for how it performs the function of a "manual selector" means the claims are not sufficiently enabled under 35 U.S.C. § 112(a).



and just adds further ambiguity.  Plaintiff's proposed construction begs the question: what is the qualifying "event" or "defensive action?"  Based on Plaintiff's abstract proposal, a person would not know the answer until *after* he or she has "carr[ied] out a defensive action" that in some way or another resulted in "the overall protection of life and limb" (regardless of whose life or limbs were under threat).  Plaintiff's overreaching and circulate construction of "defense event" is thus so broad as to encompass any event, such as an individual remaining motionless in response to a threat if doing so protected "life and limb".  Read in the context of the specification, however, the term "defense event" cannot be so unlimited in its scope.  *See Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) ("Claim language must always be read in view of the written description[.]").

Indeed, the specification here provides a list of "defense events" the applicant specifically contemplated for purposes of the purported invention.  *See* '789 Patent, Col. 6:13-21.  By providing "an illustrative list" of the types of "defense events" contemplated, the applicant "acted as his own lexicographer with respect to [a] list of permissible types" of "defense events."  *See, e.g.*, *Vertical Doors Inc. v. Howitt*, No. SACV 0600984, 2007 WL 6548859, at *13 (C.D. Cal. Dec. 14, 2007).  Furthermore, Plaintiff's suggestion that the patent-in-suit contemplates an embodiment that merely communicates information to law enforcement or emergency medical responders (Dkt. No. 31, at 10) ignores that such functionality "may ***optionally*** be implemented . . . ***in response*** to the initiation of a defense event[.]"  '789 Patent, Col. 19:21-24.  In other words, the specification distinguishes between a "defense event" and the transmittal of information to law enforcement and emergency medical responders, such that the transmission of information by itself is not a qualifying "defense event."  Plaintiffs reliance on the embodiment disclosed at Col. 19:25-28, which features a "projector unit 300" along with an *optional* transmitter, only reinforces this point.

Plaintiff complains that the applicant left the door open to other types of



"defense events" based on the generic catch-all phrase "other defense events may also be implemented." Dkt. No. 31, at 11. But this attempt to cover situations the applicant did not contemplate as "defense events" (*e.g.*, standing motionless in the face of danger) fails all the same. Like the instant matter, the applicant in *Howitt* used open-ended language in its list of exemplary "springs," noting that "[t]he spring used [in the invention] **may** be a conventional spring **such as** a coil spring, or it **may be** a gas strut, a combination device **or other types** of gas or metal spring." *Howitt*, 2007 WL 6548859, at *13 (emphasis added). Even in light of this open-ended language, the *Howitt* court found that the applicant "clearly intend[ed] to provide an illustrative list of springs . . . to put one reasonably skilled in the art on notice" of the applicant's own definition of "spring." *See id.* Here, too, Plaintiff should not be permitted to reach beyond the definition of "defense event" that the applicant included in the four corners of the patent-in-suit, especially where the Plaintiff's proposed construction is so broad as to render the supposed invention little more than an abstract idea.

Lastly, and contrary to Plaintiff's assertion that GreatCall is improperly "importing the limitation of the specification," GreatCall's proposed construction merely recognizes that *the applicant* prescribed the scope of "defense event" within the context of the patent-in-suit. This distinguishes the instant case from the various cases Plaintiff cites to address the general principal against reading preferred embodiments as claim limitations, which is inapplicable here as discussed above. Dkt. No. 31, at 12. Because Plaintiff's proposed construction of "defense event" is inconsistent with the definition provided by the patent-in-suit, it should be rejected.

### F.    "Self-Defense System"

Plaintiff all but concedes that the term "self-defense system" is non-limiting preamble. *See* Dkt. No. 31, at 2. Because Plaintiff offers no explanation for how or why the preamble is "necessary to give life, meaning, and vitality" to the claims, the analysis should end there. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F. 3d



1298, 1305 (Fed. Cir. 1999).  In any event, Plaintiff's proposed construction stretches "self-defense system" far beyond what the specification contemplates, as it even applies to defense of others (not just one's "self").

## G.    The "Comparator" Terms

For each of the "comparator" terms currently at issue (discussed on pages 23-25 of GreatCall's opening brief and pages 16-17 and 21 of Plaintiff's), Plaintiff offers just one criticism of GreatCall's position that the term's "plain and ordinary meaning" applies—specifically, that GreatCall supposedly ignores the specification and focuses on extrinsic evidence.  Dkt. No. 31, at 17, 18, 22.  Once more, Plaintiff misapprehends the legal underpinnings of claim construction.  A term's "plain and ordinary meaning" (which is effectively the *broadest* interpretation of that term) applies unless the patentee has acted as its own lexicographer and defined the term in the intrinsic record.  *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1362, 1366 (Fed. Cir. 2002).  GreatCall's assertion that the "plain and ordinary meaning" applies here simply reflects the *unrebutted* proposition that the intrinsic record does not define what a "comparator" is.


DATED:  April 30, 2019          Respectfully submitted,

                                KILPATRICK TOWNSEND & STOCKTON LLP


                                By:*/s/ Megan M. Chung*
                                   MEGAN M. CHUNG

                                Attorneys for Defendant
                                GREATCALL INC.

71864527V.1