1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jerry A. Crandall (CSB No. 250192)
jac@crandalltech.com
CRANDALL TECHNOLOGIES LLC
1590 Heavenly View Trail
Reno, NV 89523
Telephone:  775.525.8777
Facsimile:   775.501.5157

*Attorney for Plaintiff*
*CRANDALL TECHNOLOGIES LLC*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

CRANDALL TECHNOLOGIES LLC,
a Nevada limited liability company,

        Plaintiff,

   vs.

GREATCALL INC., a Delaware
corporation,

        Defendant.

Case No. 3:18-cv-1396-CAB-(MDD)

**PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF
LIMITATION OF DAMAGES, NO
WILLFUL INFRINGEMENT AND
INVALIDITY**

Hearing Date:  January 3, 2020
Courtroom:  4C, 4th Floor

Judge:  Hon. Cathy Ann Bencivengo

**PER CHAMBER RULES, NO
ORAL ARGUMENT UNLESS
SEPARATELY ORDERED BY
THE COURT**

///
///
///
///

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................. ii

MEMORANDUM OF POINTS AND AUTHORITIES ........................... 1

I.    INTRODUCTION ................................................................... 1

II.   LEGAL STANDARDS .......................................................... 1

III.  ARGUMENTS ...................................................................... 2

      A.    Plaintiff Can Recovery Damages for any Direct Infringement that Occurred Prior to Actual Notice of Infringement ....................... 2

      B.    Finding of Willful Infringement is Proper Where Defendant had Actual Notice of Patent prior to Lawsuit and then Engaged in Egregious Post-filing Conduct ............................................ 4

      C.    There is Sufficient and Admissible Evidence to Support Damages for Defendant's Infringement ............................................... 6

      D.    There is Sufficient Evidence to Support a Finding of Induced Infringement under 35 U.S.C. § 271(b) ................................. 11

      E.    There is Sufficient Evidence to Support a Finding of Contributory Infringement under 35 U.S.C. § 271 (c) ................................ 13

      F.    There is Sufficient Evidence to Support Findings of Direct Infringement under 35 U.S.C. § 271(a) as well as Indirect Infringement ................................................................. 15

            1.    "material sized to conform to an appendage" .................. 16

            2.    "pressure sensor unit" ............................................. 18

            3.    Written Description and Enablement ............................ 20

            4.    "defense unit" ...................................................... 21

            5.    "voltage differential" ............................................. 23

            6.    "manual selector" ................................................. 24

IV.  CONCLUSION .................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                 **Page(s)**

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed.Cir.2003) ………………………………………… 16

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) …………………………………………….….. 1, 2

*Apple Inc. v. Samsung Electronics Co., Ltd.*,
  258 F.Supp.3d 1013 (N.D. Cal. 2017) ……………………………..… 4

*Aqua Shield v. Inter Pool Cover Team*,
  774 F.3d 766 (Fed. Cir. 2014) ………………………………………… 10

*Brown Bag Software v. Symantec Corp.*,
  960 F.2d 1465 (9th Cir. 1992) ………………………………………… 3

*Cameron Iron Works, Inc. v. Edward Valves, Inc.*,
  175 F. Supp. 423 (S.D. Tex. 1959) …………………………..……… 2

*Douglas Dynamics, LLC v. Buyer Prods. Co.*,
  717 F.3d 1336 (Fed. Cir. 2013) ……………………………………… 10

*DSU Med. Corp. v. JMS Co.*,
  471 F.3d 1293 (Fed. Cir. 2006) …………………………………..… 13

*Edward Valves, Inc. v. Cameron Iron Works, Inc.*,
  286 F.2d 933 (5th Cir. 1961) ………………………………………… 2

*Edward Valves, Inc. v. Cameron Iron Works, Inc.*,
  368 U.S. 833 (1961) …………………………………………………… 2

*Ericsson, Inc. v. D-Link Systems, Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014) ……………………………………… 7, 8

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
  318 F.Supp. 1116 (S.D.N.Y. 1970) ………………………………….. 8, 9

*Hanson v. Alpine Valley Ski Area, Inc.*,
  718 F.2d 1075 (Fed. Cir. 1983) ……………………………………… 10

PLAINTIFF'S OPPOSITION TO           ii
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT                    Case No. 3:18-cv-1396-CAB-MDD

*In re Antor Media Corp.*,

      689 F.3d 1282 (Fed. Cir. 2012) ……………………………………….. 16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

      475 U.S. 574 (1986) ……………………………………………………… 1

*Mentor Graphics Corp. v. EVE-USA, Inc.*,

      851 F.3d 1275 (Fed. Cir. 2017) ………………………………………… 4

*PersonalWeb Technologies LLC, et al. v. International Business Machines Corp.*,

    No. 16-cv-01266-EJD,

    2017 WL 2180980 (N.D. Cal. May 9, 2017) ……………………….....… 4

*Powell v. Home Depot U.S.A., Inc.*,

      663 F.3d 1221 (Fed. Cir. 2011) ……………………………………….. 10

*Radio Steele and Mfg. Co. v. MTD Prods.*, Inc.,

      788 F.2d 1554 (Fed. Cir. 1986) ……………………………………….. 10

*Stickle v. Heublien, Inc.*,

      716 F.2d 1550 (Fed. Cir. 1983) ……………………………………….. 10

*United States v. Diebold, Inc.*,

      369 U.S. 654 (1962) ……………………………………………………… 1

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 38 (1997).

      520 U.S. 17 (1997) ……………………………………………………..15

*Water Techs. Corp. v. Calco, Ltd.*,

      850 F.2d. 660 (Fed. Cir. 1988) ……………………………………….. 13

*Zimmer Surgical, Inc., et al. v. Stryker Corporation, et al.*,

    No. 16-679-RGA-MPT,

    2017 WL 3736750 (D. Del. August 29, 2017) ……………………….. 4

**Statutes**

35 U.S.C. § 287 …………………………………………………… 2, 3

35 U.S.C. § 271(a) ……………………………………………… 15

35 U.S.C. § 271(b) ……………………………………………… 11

35 U.S.C. § 271(c) ……………………………………………………….. 13

35 U.S.C. § 282(a) ……………………………………………………… 16

**Other Authorities**

CivLR 7.1.e.2 ……………………………………………………………. 1

Fed. R. Civ. P. 26(a)(3) ………………………………………………… 8

Fed. R. Civ. P. 56(a)……………………………………………………. 1

# TABLE OF EXHIBITS

| No. | Description | Total Page(s) |
|---|---|---|
| BR | Lively Wearable Financial Disclosure (GreatCall0000302) (document to be *sealed* per Doc. No. 53) | 2 |
| BS | Lively Wearable Schematic (GreatCall0000303) (document to be *sealed* per Doc. No. 53) | 2 |
| BT | Defendant's Responses to Plaintiff's 1st Set of Requests for Admission (dated May 9, 2019) | 43 |
| BU | Defendant's Responses to Plaintiff's 2nd Set of Requests for Admission (dated June 14, 2019) | 15 |
| BV | Defendant's Responses to Plaintiff's 1st Set of Interrogatories (dated June 14, 2019) | 7 |
| BW | Defendant's Responses to Plaintiff's 2nd Set of Interrogatories (dated July 22, 2019) | 9 |
| BX | Defendant's Supplemental Responses to Plaintiff's 3rd Set of Interrogatories (dated October 2, 2019) (document to be *sealed* and *redacted copy* submitted per Doc. No. 53) | 14 |
| BY | Defendant's Second Supplemental Responses to Plaintiff's 3rd Set of Interrogatories (dated November 11, 2019) (document to be *sealed* and *redacted copy* submitted per Doc. No. 53) | 7 |
| BZ | Morgan Stanley Financial Analysis of Wearable Devices (CRAN-GREATCALL00008078 through CRAN-GREATCALL00008179) | 103 |
| CA | Internal Memoranda of Defendant regarding Features of the Lively Wearable Smartphone Application (GreatCall000655 through GreatCall000664) | 11 |
| CB | Lively Wearable Customer Service Protocols of Defendant | 15 |

| | (GreatCall000819 through GreatCall000832) (document to be *sealed* per Doc. No. 53) | |
|---|---|---|
| CC | Phone Scoop Image of Smart 2 (CRAN-GREATCALL00008302) | 2 |
| CD | Phone Scoop Technical Review of Smart 2 (CRAN-GREATCALL00009064 through CRAN-GREATCALL00009070) | 8 |
| CE | Walmart Image of Smart 2 (CRAN-GREATCALL00008303) | 2 |
| CF | Walmart Advertisement of Smart 2 (CRAN-GREATCALL00009025 through CRAN-GREATCALL00009041) | 18 |
| CG | Screenshot of Lively Wearable Quick-Start Guide as shown on Defendant's Website on July 9, 2019 (CRAN-GREATCALL00002926) | 2 |
| CH | Mediatek MT6738 Processor Manufacturer Specifications detailing Quad-Core, ARM Cortex A53 CPU (CRAN-GREATCALL00009051 through CRAN-GREATCALL00009055) | 6 |
| CI | Quad-Core, ARM Cortex A53 CPU Technical Reference Manual (selected pages) (CRAN-GREATCALL00008405, CRAN-GREATCALL00008448, CRAN-GREATCALL00008449) | 4 |

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

On November 27, 2019, Defendant GreatCall Inc. ("Defendant") filed a Notice of Motion and Motion for Summary Judgment (Doc. No. 50), which provides notice of a hearing date of January 3, 2020, for said motion. *Id.* at page 2. In accordance with CivLR 7.1.e.2, Plaintiff hereby timely provides this Opposition to Defendant's Motion for Summary Judgment no later than fourteen (14) calendar days prior to the noticed hearing.

In accordance with Section II.C of the Hon. Judge Bencivengo's Civil Case Procedures, Plaintiff is not including in this Opposition a separate Statement of Fact. Rather, various additional material facts that are omitted in Defendant's Motion for Summary Judgment are addressed herein where appropriate.

In accordance with this Court's order in Doc. No. 53, Defendant's Exhibits AA, BB, CC, DD and EE (which correspond herein to Plaintiff's Exhibits BR, BS, BX, BY and CB) are to be filed under seal. Redacted versions of Defendant's Exhibits CC and DD (Plaintiff's Exhibits BX and BY) are filed herewith.

## II.   LEGAL STANDARDS

Summary judgment is only proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For a dispute about a material fact to be "genuine", a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. *Id.* In deciding whether to grant summary judgment on an issue, a court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,475 U.S. 574, 587 (1986), citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). If a conflict arises between the evidence presented by both

sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III. ARGUMENTS

### A. Plaintiff Can Recovery Damages for any Direct Infringement that Occurred Prior to Actual Notice of Infringement

Defendant argues that Plaintiff cannot recover damages prior to June 28, 2018, but Defendant is incorrect as a matter of law for a number of reasons.

Where the patent owner does not itself make or sell devices covered by the patent, then the patent owner is not required to provide notice of infringement under 35 U.S.C. § 287. *See Cameron Iron Works, Inc. v. Edward Valves, Inc.*, 175 F. Supp. 423, 437 (S.D. Tex. 1959) ("Plaintiff has not, since the issuance of the Allen patent, manufactured or sold valves coming under the Allen patent or any of its claims and, therefore, no notice of infringement was required of plaintiff by law under 35 U.S.C. 287."), *affirmed Edward Valves, Inc. v. Cameron Iron Works, Inc.*, 286 F.2d 933 (5th Cir. 1961), *cert. denied Edward Valves, Inc. v. Cameron Iron Works, Inc.*, 368 U.S. 833 (1961). Plaintiff has never made or sold any systems or devices covered by the patent-in-suit, as Defendant's own arguments in the Motion make clear, and therefore there were never any patented articles produced by Plaintiff that would have promoted innocent infringement if such articles were never marked. As a matter of law, Plaintiff is therefore excused from providing notice under § 287.

The foregoing notwithstanding, in the recent Order on Joint Motion for Determination of Discovery Dispute [Doc. No. 44] in this action, the Court held that the undersigned attorney, who is the founder and sole member of Plaintiff, shall be prevented from viewing Defendant's highly confidential information in this lawsuit despite that information's relevancy to the case. *See id.*, page 3, line 8 through page 4, line 1. The Court justified this ruling by indicating its understanding that Plaintiff and Defendant are competitors. *See id.* at page 1, line

23 through page 3, line 7, *applying Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465 (9th Cir. 1992).  *See also* Doc. No. 44, page 2, lines 13-16, *citing Brown Bag*, 960 F.2d 1465 at 1470 (emphasis added).  The First Amended Complaint [Doc. No. 21; hereinafter "the FAC"] states that Plaintiff has listed the patent number (U.S. Patent No. 8,854,789 B2) of the patent-in-suit on its company website since November 16, 2016.  *See* FAC, ¶ 89.  Plaintiff also presented date-stamped documentation from December 29, 2016, as evidence of this fact.  *See* Doc. Nos. 21-47 and 21-48.  *See also* Doc. No. 21-49.  In so much as this Court has already determined that the parties are competitors, Defendant had an obligation prior to the instant lawsuit to conduct a good faith investigation of any patents that were listed on Plaintiff's (*i.e.*, Defendant's competitor's) website.  This obligation, by a corporate entity that sells consumer products and services in the American marketplace, caused the listing of the patent-in-suit on Plaintiff's website to constitute constructive notice to Defendant of the patent-in-suit, for purposes of damages calculations, as of November 16, 2016.  Therefore, the Court should deny Defendant's request for partial summary judgment barring Plaintiff from recovering damages prior to June 25, 2018, on this additional basis.

Finally, with respect to actual notice, § 287(a) expressly provides, *inter alia*, that "[f]iling of an action for infringement shall constitute such notice."  Thus, this statute specifically references the date that a civil action is filed rather than the date that an allegedly infringing party is served with notice of said action.  The present lawsuit was filed on June 25, 2018 (not June 28, 2018; *see* Doc. No. 1), and therefore Defendant's attempt to limit Plaintiff's recovery of damages to the period of time after June 28, 2018, must be denied on this additional basis as well.[1]

---

[1] Defendant's request is inconsistent in that it also asks the Court to grant partial summary judgment barring Plaintiff from recovering any damages prior to June 25, 2018.  *See* Doc. No. 50-1, page 11, lines 21-23.

**B.     Finding of Willful Infringement is Proper Where Defendant had Actual Notice of Patent prior to Lawsuit and then Engaged in Egregious Post-filing Conduct**

Precedent exists within the 9th Circuit (and beyond) establishing that post-filing conduct alone can serve as the basis of a jury's willfulness finding and an award of enhanced damages. *See, e.g., Apple Inc. v. Samsung Electronics Co., Ltd.*, 258 F.Supp.3d 1013, 1027 (N.D. Cal. 2017). *See also Zimmer Surgical, Inc., et al. v. Stryker Corporation, et al.*, No. 16-679-RGA-MPT, 2017 WL 3736750, at *2 (D. Del. August 29, 2017) (*in accord* with the analysis in *Apple*). Indeed, in patent infringement actions, a patentee is permitted to present evidence of post-filing willful infringement even where the patentee does not seek a preliminary injunction. *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1295-1296 (Fed. Cir. 2017) (Federal Circuit holding that the district court erred in concluding that the patentee could not present evidence of post-filing willful infringement). *See also PersonalWeb Technologies LLC, et al. v. International Business Machines Corporation*, No. 16-cv-01266-EJD, 2017 WL 2180980, at *20-21 (N.D. Cal. May 9, 2017) (in view of *Mentor Graphics*, denying defendant's motion for summary judgment of no willful infringement).

On March 1, 2019, this Court granted Plaintiff leave to add a claim of willful infringement in Plaintiff's amended pleading. *See* Doc. No. 20. In this Order, the Hon. Judge Bencivengo noted, "The primary purpose of the proposed amended complaint is to add a claim for willful infringement based on <u>Defendant's actions since this lawsuit was filed</u>." *See id.*, page 2, lines 3-5 (emphasis added). The Court, in following 9th Circuit precedent on point, thereby deemed that post-filing conduct can be sufficient to demonstrate willful infringement. Additionally, although refusing to allow paragraphs 196 through 205 of the proposed amended complaint [Doc. No. 18-2] to appear in Plaintiff's amended pleading, while specifically noting that such paragraphs are "irrelevant to any alleged willful

infringement by Defendant" (Doc. No. 20, page 2, line 15), the Hon. Judge Bencivengo evidently determined that paragraphs 189 through 195 of Doc. No. 18-2 (which document the presented evidence of Defendant's actual notice of the patent-in-suit <u>prior</u> to this lawsuit as well as Defendant's deceptive, post-filing advertising scheme) were indeed relevant to Plaintiff's willful infringement claim.[2]

While Plaintiff initially sent a first copy of the patent-in-suit to Defendant on June 13, 2018, Defendant undoubtedly had actual notice of the patent-in-suit at least as early as June 22, 2018, which preceded the initiation of this lawsuit.  *See* the FAC, ¶ 193, *citing* Exhibits AY through Exhibit BA [Doc. Nos. 21-51 through 21-53, respectively].  This evidence documents a follow-up e-mail communication to Defendant that included a second copy of the patent-in-suit along with a copy of an earlier letter to Defendant dated June 13, 2018; this e-mail was successfully sent to Defendant on June 22, 2018.  *See also* Doc. No. 26 (hereinafter Defendant's "Answer") at page 4, paragraph 28, wherein Defendant admits that it "received an email with a letter dated June 13 from Plaintiff."  Furthermore, while ¶¶ 189 through 195 of the FAC already document Defendant's deceptive, post-filing advertising scheme, Plaintiff has uncovered additional information during Discovery that further bolsters Plaintiff's claim of willful infringement. Specifically, with respect to Defendant's Smart 2 smartphone, which Defendant began selling in the U.S. on September 3, 2018 (*see* Doc. No. 21-36, page 2), which was <u>after</u> this lawsuit had been initiated, "Defendant admits that Lively by GreatCall is pre-installed on all Jitterbug Smart 2 devices."  Ex. BU at page 12, lines 1-2 and 14-15.  "Lively by GreatCall" is a new, rebranded version of the Lively Wearable Smartphone Application referenced in the FAC.  *See* Ex. CA, page 2.  In so much as this application is preinstalled on all Smart 2 devices,

---

[2] ¶¶ 189 through 195 of Doc. No. 18-2 correspond to ¶¶ 189 through 195 of the FAC, respectively.

Defendant has eliminated the need for a user to (in Defendant's own words) "download and install the Lively Wearable App on his or her smartphone" (Doc. No. 50-1:8:22-23), when the Smart 2 device is to be used with the Lively Wearable Device.  Such a product development makes it even easier for Defendant's end users to infringe the patent-in-suit, and Defendant <u>knowingly</u> took this step <u>after</u> this lawsuit had been initiated, thereby indicating that Defendant purposefully took yet another step to (i) induce, and contribute to, the direct infringement of the patent-in-suit by Defendant's customers and (ii) multiply its own instances of direct infringement of the patent-in-suit.[3]

### C.   There is Sufficient and Admissible Evidence to Support Damages for Defendant's Infringement

Defendant regularly advertises a purchase price for the Lively Wearable Device of $49.99 (U.S. dollars).  *See* Doc. No. 21-11, page 4.  Additionally, Defendant's subscription service, for use with the purchased Lively Wearable Device, to the 5Star Urgent Response Service costs $14.99 (U.S. dollars) per month.  *See* Doc. No. 21-12, page 5.[4]  Defendant has already disclosed to Plaintiff the number of units of the Lively Wearable Device that have been manufactured in the U.S.  *See* Ex. BY, page 4, lines 22-24; Ex. BW, page 7, lines 14-17.  Defendant has also disclosed to Plaintiff the number of units of the Lively Wearable Device that have been sold since the product's initial launch.  *See* Ex. BR, page 2. Defendant has also disclosed its calculation of the revenue generated from this device.  *See id.*  Defendant has further disclosed, for the 12 month period ranging from September, 2017, to August, 2018, (i) the monthly gross sales of the Lively

---

[3] *See* Defendant's Answer at ¶¶ 72 and 74, wherein Defendant admits to its own use of the infringing instrumentality during product development and testing.

[4] It is noted that the Lively Wearable Device initially retailed in 2016 for $99.99, with service starting at $14.99 per month.  See Doc. No. 21-26, page 3.

Wearable Device (ii) the monthly returns of (as well as the return rate for) the Lively Wearable Device (iii) the number of new service subscribers (the Net) on a monthly basis for this device and (iv) the number of subscribers who canceled (the Churn) on a monthly basis their service subscriptions for this device (as well as the monthly churn rate for this service). *See id.* Furthermore, Defendant has disclosed the total number of monthly subscribers to the service for this device for each of the months ranging from September, 2017, to August, 2018. From these admissions by Defendant, the average monthly device sales and service subscriptions attributable to the Lively Wearable device can be calculated.

Additionally, the fact-finder must also consider any contributions that the Lively Wearable Device has had on device sales for Defendant's own smartphones when deciding how damages should be augmented as a result of the Defendant's Touch3, Smart and Smart 2 smartphones all being compatible with the Lively Wearable Device. *See, e.g., Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1228 (Fed. Cir. 2014) (discussing incremental value of patented feature). For example, with respect to the Smart 2, which Defendant's own product announcement stated was not available to be purchased in the U.S. until September 3, 2018 (i.e., <u>after</u> this lawsuit commenced), Defendant stated that the "Smart2 is available for $149.99", and that data plans for the Smart 2 "are as low as $17.48 a month". *See* Doc. No. 21-36, page 3. Moreover, in a disclosure dated November 11, 2019, which the Hon. Magistrate Judge Dembin ordered be produced (*see* Doc. No. 44) after Defendant had continuously attempted to undermine the discovery process in this action, Defendant *finally* disclosed the number of Smart 2 devices that have been sold in the U.S. Ex. BY, page 5, lines 17-18. Furthermore, on October 2, 2019, after the fact discovery deadline of September 23, 2019, for this action had already passed, Defendant *finally* disclosed the identity of Defendant's current employee (Mr. Brian Aman) who has knowledge of Defendant's sales figures in the U.S. for the Lively Wearable Device, the GreatCall Touch3

smartphone, the Jitterbug Smart smartphone and the Jitterbug Smart2 smartphone. Ex. BX, page 12, lines 7-12. Plaintiff intends to call Mr. Aman as a witness at trial to provide additional clarifying information to the jury; this Court has already determined that the deadline to comply with the Pretrial Disclosure requirements of Fed. R. Civ. P. 26(a)(3) is January 31, 2020. Doc. No. 17, ¶ 25.

Next, as explained in detail in the FAC, Defendant realizes the majority of its gross revenue associated with the Lively Wearable Device from the sale of the 5Star Urgent Response Service rather than from the sale of the physical Lively Wearable Device. *See* Doc. No. 21, ¶¶ 203-204. Plaintiff has already produced evidence showing that a reasonable royalty rate for this service-focused system should fall in the range of 12.5% [*see* Doc. No. 50-10, page 5] and 13.2% [*see* Doc. No. 50-11, page 1], and Plaintiff has already proposed to Defendant that the lower figure of 12.5% be adopted in this case. The undersigned attorney for Plaintiff, Mr. Jerry Crandall, who graduated *magna cum laude* and *with Honors* in the field of Electrical Engineering at the University of California, Riverside, who received academic credit at the University of California, Riverside in the field of economics, who was the treasurer of a law firm specializing in U.S. patent law for over six (6) years, and who has served as the treasurer of Plaintiff (a limited liability company specializing in technology development and licensing) for over four (4) years, hereby respectfully submits that the documentation shown in Doc. Nos. 50-10 and 50-11 is indeed reliable, and that a royalty rate of 12.5%, which is merely half that of the Federal Circuit's previously implemented 25% rule, is reasonable in this case. *See* Crandall Decl., ¶¶ 2, 3, 8 and 9. Indeed, to date, Defendant has failed to disclose to Plaintiff or the Court *any* royalty rate that Defendant feels would be reasonable (or provide any evidence whatsoever of such a royalty rate). Moreover, it is absolutely proper for the Court to instruct the jury on the issue of a reasonable royalty rate, such as, for example, by guiding the jury in its evaluation of the *Georgia-Pacific* factors. *See, e.g., Ericsson*, 773 F.3d 1201,

1231, *citing Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y. 1970).

Finally, as stated in the FAC at ¶ 93, Best Buy Co., Inc. (Best Buy) has filed a Quarterly Report with the U.S. Securities and Exchange Commission (SEC) for the quarterly period that ended on November 3, 2018. A copy of this Quarterly Report, which is dated December 7, 2018, is included in Doc. No. 21-55. This Quarterly Report states, "On October 1, 2018, [Best Buy] acquired all of the outstanding shares of GreatCall, Inc. ("GreatCall") for net cash consideration of $792 million." Doc. No. 21-55, page 12. The "fair value" of the Goodwill and Intangible Assets acquired from this acquisition was assumed by Best Buy on October 1, 2018, to be $496 million and $371 million, respectively. *See* Doc. No. 21-55, page 13. Moreover, the Quarterly Report also states:

> The components of Intangible assets included consumer customer relationships of $235 million (amortized over 5 years), tradename of $61 million (amortized over 8 years ), developed technology of $52 million (amortized over 5 years ) and commercial customer relationships of $23 million (amortized over 10 years ).

*Id*. Additionally, as stated in ¶ 94 of the FAC, following the corporate acquisition of Defendant by Best Buy, Defendant continued to advertise two (2) different phones (the Jitterbug Smart 2 and the Jitterbug Flip) as well as two (2) other devices (the Lively Mobile and the Lively Wearable Device) on its website. *See* Doc. No. 21-56 (showing Defendant advertising these four (4) devices).

In so much as the "developed technology" referenced in the aforementioned SEC documentation includes the infringing instrumentality at issue, Plaintiff finds that any valuation of the Lively Wearable Device should be based on Best Buy's recent valuation of Defendant's developed technology of $52 million (amortized over 5 years), particularly being that (1) the Lively Wearable Device is one of only four (4) devices advertised on Defendant's website following the aforementioned recent acquisition of Defendant by Best Buy and (2) this collection of core

company devices in tandem with the 5Star Urgent Response Service have collectively lead to the substantial consumer customer relationships and goodwill that yielded an overall corporate purchase price of $792 million.  Therefore, Plaintiff finds $52 million to constitute a first basis for calculating damages. Plaintiff proposes that one-fourth of this amount, or $13 million, is attributable to the infringing instrumentality.  Plaintiff further proposes that 12.5 % (the proposed reasonable royalty rate) of this $13 million, or $1,625,000.00, should constitute a first threshold of the applicable damages range.[5]

To the extent that Defendant now attempts to argue that its profits associated with the Lively Wearable Device do not justify a compensatory damages award of $1,625,000.00, Plaintiff notes that where an infringer actually made unexpectedly low profits, or even lost money, from its infringing use may have little or no relevance, and a reasonable royalty may exceed the infringer's actual profit.  *See Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 771-772 (Fed. Cir. 2014); *Douglas Dynamics, LLC v. Buyer Prods. Co.*, 717 F.3d 1336, 1346 (Fed. Cir. 2013); *Radio Steele and Mfg. Co. v. MTD Prods., Inc.*, 788 F.2d 1554, 1557 (Fed. Cir. 1986); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081 (Fed. Cir. 1983); *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1238-1239 (Fed. Cir. 2011), *citing Stickle v. Heublien, Inc.*, 716 F.2d 1550, 1563 (Fed. Cir. 1983).  On July 19, 2019, Plaintiff produced a document authored by Morgan Stanley that contains additional information that is pertinent to the value of wearable technology.  *See* Ex. BZ.  Exhibit 2 of the Executive Summary of this document, for example, states that "**Wearables** Address $1.6T of Global Consumer and

---

[5] The basis of $52 million may need to be increased, such as, for example, if the infringing instrumentality has contributed to the consumer customer relationships valued at $235 million (amortized over 5 years).  This would yield a higher basis of $287 million.

Business Spending", with 185 billion U.S. dollars of that amount being attributable to the "Fitness and **Wellness**" sector. *Id.*, page 7 (emphasis added). This Morgan Stanley documentation, along with Best Buy's recent valuation of Defendant's developed technology of $52 million (amortized over 5 years), as reported to the SEC <u>following</u> the commencement of this lawsuit, is evidence that must be taken into consideration by the fact finder when deciding upon a reasonable royalty.

### D. There is Sufficient Evidence to Support a Finding of Induced Infringement under 35 U.S.C. § 271(b)

First, the record is already clear that Defendant knew about the patent-in-suit prior to the initiation of this lawsuit. On June 13, 2018, Plaintiff sent to Defendant a hard copy of the patent-in-suit to Defendant's corporate headquarters in San Diego. *See* Doc. No. 21, ¶¶ 27, 90 and Doc. No. 21-50, page 2. Defendant admits that it "received eventually a letter dated June 13, 2018 from Plaintiff via the United States Postal Service." Doc. No. 11, page 4, paragraph 27. Additionally, the evidence of record clearly shows that Defendant had actual notice of the patent-in-suit at least as early as June 22, 2018, when Plaintiff sent a second copy of the patent-in-suit to Defendant. *See* Doc. No. 21, ¶¶ 28, 91 and 193 and Doc. Nos. 21-51, 21-52 and 21-53. *See also* Doc. No. 11, page 4, line 28, wherein Defendant admits to receiving this e-mail. To date, Defendant has not produced any evidence indicating that there was any delay whatsoever in its receipt of this e-mail.

Second, in addition to disclosing the number of units of the Lively Wearable Device that have been manufactured and sold, Defendant has also disclosed the total number of monthly subscribers to the service for the Lively Wearable Device for each of the months ranging from September, 2017, to August, 2018. *See* Ex. BR, page 2. These subscribers are paying for such service so that they can use the Lively Wearable Device for its intended purpose. This rather obvious and logical conclusion is supported by Doc. No. 21-24 at page 2, which indicates that twenty-two (22) distinct users have rated the Lively Wearable Smartphone Application in

the Google Play Store (for a total average score of 2.7).  *See also* Doc. No. 21-23, indicating that twenty-two (22) distinct users have rated the Lively Wearable Smartphone Application in the Google Play Store.  *See also* Doc. No. 21-43 (a later screenshot), indicating that the Lively Wearable Smartphone Application has been downloaded more than 10,000 times and that twenty-four (24) different reviews of the application have been submitted (for a total average score of 2.7). Moreover, Defendant has also gone so far as to detail a post-filing change in the user experience of ***existing users*** when they use the Lively Wearable Device for its intended purpose.  *See* Ex. CA, page 2 ("NOTICE 3/4/19: GreatCall re-launched the Lively Wearable app with an updated version … now available on Google Play store. Existing Lively Wearable customers will continue to see the below app experience until they update app.").  Furthermore, Ex. CB, page 3 illustrates a screenshot showing a scrollable list of a significant number[6] of Select Users of the Lively Wearable Device, wherein the Full Names of a smaller portion of these Users from among this significant number of individuals are visible in the scrollable list.  This screenshot comprises an illustration for an internal memorandum of Defendant dated February 4, 2019, that details certain of Defendant's updated procedures, pertaining to the Lively Wearable Device, for communicating with existing customers.  *See e.g., id.,* pages 2-3.  Thus, Defendant has already produced evidence that both identifies third-party direct infringers and details how Defendant has just recently modified its procedures for communicating with such third-party direct infringers such that said direct infringement can continue to be supported by Defendant's own conduct.

Third, it is well established that evidence of intent to induce patent infringement may either be direct evidence or indirect (circumstantial) evidence.

---

[6] Ex. CB is to be filed under seal.  These numbers of Lively Wearable users are viewable in the submitted document.

*See DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006), *citing Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d. 660, 668 (Fed. Cir. 1988). Here, with respect to the GreatCall Smart 2 smartphone, which Defendant began selling in the U.S. on September 3, 2018 (<u>after</u> this lawsuit had been initiated), "Defendant admits that Lively by GreatCall is pre-installed on all Jitterbug Smart 2 devices." Ex. BU, page 12, lines 1-2 and 14-15. "Lively by GreatCall" is a new, rebranded version of the Lively Wearable Smartphone Application referenced in the FAC. *See* Ex. CA, page 2. In so much as this application is preinstalled on all Smart 2 devices, Defendant has eliminated the need for a user to, in Defendant's words, "download and install the Lively Wearable App on his or her smartphone" (Doc. No. 50-1, page 8, lines 22-23) when the Smart 2 device is to be used with the Lively Wearable Device. Such a product development makes it even easier for Defendant's end users to infringe the patent-in-suit, and Defendant <u>knowingly</u> took this step <u>after</u> this lawsuit had been initiated.

### E. There is Sufficient Evidence to Support a Finding of Contributory Infringement under 35 U.S.C. § 271(c)

As previously discussed above, the evidence is clear that there were third-party direct infringers both prior to and after the commencement of this lawsuit, and Defendant had actual notice of the patent-in-suit at least as early as June 22, 2018. The record is also clear that the Lively Wearable Device, which Plaintiff has identified as a component of the infringing instrumentality, has no substantial non-infringing use and is a material part of the invention. Plaintiff submits that the Lively Wearable Device is analogous to the "pressure sensor unit integrated with a wireless transmitter, said pressure sensor unit configured to generate a pressure input signal", as recited in both of the independent claims (Claims 1 and 17). *See, e.g.,* FAC at ¶¶ 103 and 167. As noted in the FAC at ¶43, the Lively Wearable Device is designed to wirelessly communicate with a user's smartphone by utilizing a Bluetooth® wireless transmission protocol. *See, e.g.,* Doc. No. 21-11,

page 6 (detailing the Lively Wearable Device's Bluetooth connectivity with a smartphone: "Bluetooth® 4.1 (Low Energy), up to 150 ft. from smartphone (line-of-sight)").  Moreover, the evidence of record has already established that the objective of the Lively Wearable Device is to cause a smartphone that is wirelessly linked with the Lively Wearable Device (using a Bluetooth wireless communication protocol) to initiate a call to the Urgent Response Center.  *See, e.g.,* Doc. No. 21-12, page 5 ("Press the button to initiate communication via smartphone with an IAED-Certified 5Star Medical Alert Agent.").

Plaintiff does not need to prove that every component of the infringing instrumentality has no substantial non-infringing use and is a material part of the invention.  Rather, it is enough for a claim of contributory infringement that Plaintiff has done so with respect to the Lively Wearable Device.  Please note, however, that the Lively Wearable Device is inextricably linked to the other components of the infringing instrumentality.  For example, with respect to the Lively Wearable Smartphone Application, Defendant's user guide for the Lively Wearable Device states, "The Lively app is *required* for your Lively Wearable to operate."  Doc. No. 21-18, page 7 (emphasis added).  With respect to the 5Star Urgent Response Service, Defendant's user guide for the Lively Wearable Device further states, "Your Lively Wearable monthly subscription comes with 5Star Urgent Response Service" (*id.*, page 13) and "IMPORTANT: You *cannot* use the Lively app *until* you have activated your service online as described in the previous section" (*id.*, page 7 (emphasis added)).  Thus, the only way to use the Lively Wearable Device for its intended purpose is to (i) wirelessly link the Lively Wearable Device to a smartphone to which the Lively Wearable Smartphone Application has been downloaded and (ii) acquire a subscription to Defendant's 5Star Urgent Response Service.  This undeniable nexus between the various components of the infringing instrumentality in view of Defendant's compulsory component combination further bolsters the contributory infringement claim.

### F. There is Sufficient Evidence to Support Findings of Direct Infringement under 35 U.S.C. § 271(a) as well as Indirect Infringement

First, although Defendant states that the undersigned (inventor of the patent-in-suit) did not disclose the existence of smartphones to the USPTO, it is noted that the U.S. patent examiner communicated to the undersigned his then knowledge of the existence of cell phones when the examiner provided to the undersigned the examiner's cell phone number (to help facilitate communication) during prosecution, which the undersigned electronically recorded on January 7, 2014. *See* Crandall Decl., ¶¶ 13-15, discussing electronically date/time stamped documentation for this recording that Plaintiff previously served on Defendant.

Second, ample evidence has been presented to support Plaintiff's infringement theories. Moreover, the veritable mountain of evidence (*see, e.g.,* Exhibits A-BF [Doc. Nos. 21-1 through 21-58, respectively] filed with the FAC) that demonstrates Defendant's infringement is itself a testament to the thoroughness of Plaintiff's due diligence, and Plaintiff (which did acquire and examine a physical Lively Wearable Device during its investigation) was under no obligation to also download the Lively Wearable Smartphone Application in view of the substantial evidence already of record, particularly where doing so would mean agreeing to terms of an End User License Agreement (EULA).

Third, in addition to its literal infringement claims, Plaintiff also claims that each element of the asserted patent claims is present under the Doctrine of Equivalents. *See* Doc. No. 50-5, page 17, lines 22-27. The U.S. Supreme Court has already made clear that infringement under the Doctrine of Equivalents is a factual issue for the jury. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 38 (1997). Thus, disposing of any of the asserted patent claims at the Summary Judgment stage would be improper in this action. This is particularly true if a factual dispute exists as to whether or not a difference (if any) between

Defendant's system and any of the asserted claims is insubstantial.  *See id.* at 35. In the event that the Court were to identify a difference between an asserted claim and Defendant's system, Plaintiff, who finds that the evidence clearly shows that the asserted claims read on Defendant's system, would consequently find such a difference to be insubstantial as well.  Summary judgment is not proper here.

Fourth, "[a] prior art reference cannot anticipate a claimed invention 'if the allegedly anticipatory disclosures cited as prior art are not enabled.'"  *In re Antor Media Corp.*, 689 F.3d 1282, 1287 (Fed. Cir. 2012), *citing Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1354 (Fed.Cir.2003).  U.S. Publication 2004/0266390 ("Faucher") cited by Defendant is deficient as a technical reference. By way of example, Faucher never mentions Bluetooth unit 132 anywhere in its specification nor provides any description whatsoever of the objective of this component.  Additionally, while Faucher discloses "GPS receiver in the phone 130" (*id.* at [0025]), Faucher fails to disclose that this GPS receiver would be used to wirelessly receive Bluetooth signal 120.  As such, Faucher does not teach that which Defendant claims that it teaches, and Defendant therefore fails to meets its burden of rebutting the presumption of patent validity.  *See* 35 U.S.C. § 282(a).

### 1.   "material sized to conform to an appendage"

The Court has construed the claim term "sized to conform" as sized to have the ***same shape, outline or contour of an appendage***, and the Court has construed "appendage" as the head, arm or leg (or part thereof) of the human body.  Doc. No. 35, page 6, lines 1-3.

With respect to Defendant's smartphones (as referenced in the FAC), Defendant specifically admits that "Each of these GreatCall products are cell phones ***designed to be held in a human's hand***."  Doc. No. 19, page 7, lines 23-24 (emphasis added).  For example, in addition to Defendant's Smart 2 smartphone being designed with a size and shape that allows the user's fingers to wrap around the device, it should be pointed out that the rear side of the Smart 2 was

specifically designed to have a convex rather than flattened shape (*see* Ex. CC, page 2 and Ex. CD, page 4) that provides the phone with an ergonomic design that enables the phone to conform to a user's palm region when the user is holding the phone (*see* Ex. CE, page 2 and Ex. CF, page 2).  Thus, not only does the Housing of the Smart 2 have the ***same contour*** as parts of the human hand (*see* Doc. No. 35 at page 5, line 20 through page 6, line 5.), the evidence also shows that Defendant purposefully designed the Smart 2 to have this specific contour.

In addition to the foregoing, Defendant also shows users how to integrate smartphones linked with the Lively Wearable Device with additional materials sized to conform to an appendage.  For example, while feigning innocence, Defendant has itself purposefully published information (including multiple images) showing how a smartphone armband can be wrapped around a user's arm, wherein the user's smartphone is contained within this smartphone armband, while the user is wearing the Lively Wearable Device.  *See* Ex. CG, page 2, showing a screenshot from Defendant's website that was captured on July 9, 2019.  *See also* Doc. No. 21-12, page 4; Doc. No. 21-19, page 3.  As shown in the above-referenced images, the evidence shows that Defendant has itself used smartphone armbands in conjunction with the Lively Wearable Device, which further supports Plaintiff's direct infringement claims (in addition to the aforementioned smartphone Housing evidence).  Moreover, even if Defendant is able to prove that these smartphone armbands are made, sold and/or offered for sale by third-party vendors rather than by Defendant itself, Defendant's targeted advertising of the use of such smartphone armbands with a smartphone together with the Lively Wearable Device certainly supports Plaintiff's indirect infringement claims.  *See* the FAC, ¶¶ 178 and 183.

As a second example, Defendant has published information showing users how to carry a smartphone wirelessly linked with the Lively Wearable Device in a user's clothing pocket while the user wears the Lively Wearable Device.  *See, e.g.,* Doc. No. 21-15, pages 6 and 9.  Such clothing is analogous to the "material sized

to conform to an appendage". *See, e.g., id.,* showing the collar portion of the user's vest as having the same shape as the user's neckline while the vest simultaneously has armholes defined therein that exactly match the circumference of the user's upper arms.  Defendant has itself used such clothing in conjunction with the Lively Wearable Device, which further supports Plaintiff's direct infringement claims.  Moreover, even if Defendant is able to prove that such clothing is made, sold and/or offered for sale by third-party vendors rather than by Defendant itself, Defendant's targeted advertising of the use of such clothing with a smartphone wirelessly linked with the Lively Wearable Device supports Plaintiff's indirect infringement claims.  *See* the FAC, ¶¶ 177 and 182.

### 2. "pressure sensor unit"

First, Defendant is attempting to mischaracterize Plaintiff's infringement contentions pertaining to the "pressure sensor unit" when Defendant states that Plaintiff "contends that the Urgent Response Button of the Lively Wearable Device meets this limitation" Doc. No. 50-1, page 24, lines 5-6.  This is utterly untrue.  As seen in Doc. No. 50-6 ("the Claim Chart") at page 7, Plaintiff contends that "the Lively Wearable Device [rather than merely the Urgent Response Button thereof] is analogous to the "pressure sensor unit integrated with a wireless transmitter, said pressure sensor unit configured to generate a pressure input signal", as claimed.

Second, in addition to the evidence previously of record in this action, Defendant's own admissions provide even further support that its Lively Wearable Device is analogous to this claim feature.  Defendant admits that the Lively Wearable Device includes a Wireless Transmitter.  *See* Doc. No. 11, page 7, paragraph 52.  *See also* Defendant's Answer, page 7, paragraph 52.  Additionally, and with reference to the circuit schematic for the Lively Wearable Device shown in Ex. BS at page 2, Defendant admits:

- "[t]he component labeled as ANT in GreatCall0000303 refers to a radio frequency antenna" (Ex. BX, page 7, lines 6-7);

- "[t]he component labeled as U2 in GreatCall0000303 refers to a radio frequency (RF) front end" (Ex. BY, page 3, lines 20-22);

- "[t]he circuitry … labeled as RF CIRCUIT can transmit a radio frequency signal" (Ex. BX, page 8, line 16 through page 9, line 19);

- "[t]he mechanical switch labeled (SWl) in GreatCall0000303 is the Urgent Response Button" (Ex. BY, page 4, lines 15-16);

- "VBAT in GreatCall0000303 refers to a voltage of the battery" (Ex. BX, page 7, lines 13-14); and

- "VCC in the schematic shown in GreatCall0000303 refers to voltage at the common collector" (Ex. BX, page 7, lines 16-17).

Furthermore, "Defendant admits that after communication has been established between the Lively Wearable Device and the Lively Wearable Smartphone Application, a user is able to push the Urgent Response Button on the Lively Wearable Device to cause a wireless transmitter of the Lively Wireless Device to transmit a wireless signal" (Doc. No. 11, page 7, ¶ 60) and also "admits that the wireless signal can be received by a smartphone." Doc. No. 11, pages 7-8, paragraph 60. Defendant further admits in its Motion the following:

> The Urgent Response button comprises a KMR231GLFS series microminiture SMT top actuated switch. … Applying **enough force** on the top of the button to cause the button to travel 0.25mm +/- 0.1 mm ultimately making an electrical contact **closing the electrical circuit**.

Doc. No. 50-1, page 24, line 28 through page 25, line 3 (emphasis added). Thus, Defendant's own admissions show that applying a sufficient degree of pressure to the Urgent Response Button causes the electronic circuit (powered by VBAT) of the Lively Wearable Device to generate both an electronic signal as well as a RF signal. This comports with the Court's construction of "pressure sensor unit": "a device [the Lively Wearable Device] containing one or more pressure sensors [the electronic circuit together with the Urgent Response Button] senses applied pressure [enough force to close the electrical circuit] and generates an electronic

[the resulting electronic signal], electromagnetic [the resulting RF signal] or optical signal". Doc. No. 35, page 2, lines 16-18 (emphasis in original omitted).

### 3. Written Description and Enablement

For at least the forgoing rationale above regarding the "pressure sensor unit" claim feature, Defendant's written description and enablement argument lacks any merit whatsoever. Again, as seen in the Claim Chart at page 7, Plaintiff contends that the Lively Wearable Device as a whole, rather than merely the Urgent Response Button thereof, is analogous to the "pressure sensor unit integrated with a wireless transmitter, said pressure sensor unit configured to generate a pressure input signal", as claimed". Nowhere in the patent-in-suit is a pressure sensor unit or pressure sensor defined such that a push button or electronic switch could not comprise a part of such a device.

Moreover, the extrinsic evidence of record shows that (i) pressure sensors were previously well-known in the art and (ii) pressure sensors can indeed include push buttons or electronic switches. *See* Doc. No. 31-1, page 10: Webster's New World Dictionary of the American Language (2nd College Ed.), (1986), New York, NY: Prentice Hall Press, page 1126, the first definition of "pressure" ("***a pressing or being pressed***; compression; squeezing") (emphasis added). *See* Doc. No. 31-2, page 3: Microsoft Computer Dictionary (5th Ed.), (2002), Redmond, WA: Microsoft Press, page 472, the definition of "sensor" ("A device that ***detects*** or measures something ***by converting nonelectrical energy to electrical energy***.") (emphasis added). *See also* Doc. No. 31-7 at page 3: McGraw-Hill Dictionary of Scientific and Technical Terms (5th Ed.), (1994), McGraw-Hill Inc., page 1794, wherein the dictionary definition of "sensor", "The generic name for a device that ***senses*** either the absolute value or a change in a physical quantity such as ... ***pressure*** ... and ***converts that change into a useful input signal*** ....."). The Hon. Judge Bencivengo even indicated in the Claim Construction Hearing of May 23, 2019, that pressure sensors are well-known devices.

Furthermore, the record establishes that the terms "pressure sensor unit" and "pressure sensor" are not only enabled, but are also sufficiently clear in the written description.  In the claim term "pressure sensor unit", the language "pressure sensor" clearly modifies the word "unit" as indicating the implementation of a pressure sensor.  Indeed, even Defendant has previously admitted that the "specification is clear" that the term "pressure sensor unit" contains "a pressure sensor".  Doc. No. 30, page 12, lines 1-2 (emphasis added).  Defendant's patent validity attack on grounds of clarity and lack of enablement are surely misplaced.

### 4.    "defense unit"

The evidence of record clearly shows that the Lively Wearable Smartphone Application and the Smartphone (to which the Lively Wearable Smartphone Application is downloaded such that the Lively Wearable Device can function for its intended purpose) are together analogous to the claimed "defense unit" at least because these components collectively function to initiate a "defense event".

The Court has construed the claim term "defense event" as, for example:

(5) Capturing information pertaining to the event, and/or
(6) Routing an amount of captured information to a preselected entity (e.g., law enforcement agency, emergency medical response)
(7) Or other events that are similar in kind.

Doc. No. 35, page 3, lines 15-22 (emphasis added).  The Court also stated, "The patent supports an interpretation of "a defense unit" **as one or more of the disclosed arrangements that can initiate one or more of the defined events the patentee identified as "defense events."** *Id.*, page 3, lines 5-7 (emphasis in original).  Finally, the Court construed the term "defense unit" as, for example:

- Audio input unit (microphone);
- Geolocation unit (GPS); or
- Transmitter to route captured information.

*See id.*, page 3, line 23 – page 4, line 8.

### <u>Microphone</u>

Defendant admits that each of its smartphones that are named in the Claim Chart (*i.e.*, the GreatCall Touch3, the Jitterbug Smart and the Jitterbug Smart 2) include a microphone. *See* Ex. BU, page 5, line 14, page 7, line 15, page 9, line 19. Evidence also shows that a number of third-party smartphones capable of being used with the Lively Wearable Device and the Lively Wearable Smartphone Application also have microphones, and that such a microphone enables the smartphone (whether Defendant's smartphone or otherwise) to ***capture audio information*** during an emergency call to the Urgent Response Center. *See, e.g.,* Doc. No. 21-11, page 2 (describing the Urgent Response Button of the Lively Wearable Device as "an Urgent Response button that works with your smartphone so you can get help if you're ever feeling unwell and need assistance right away"). *See also, e.g., id.* at page 3 ("Simply press the button to <u>speak</u> with a 5Star Urgent Response Agent <u>through your smartphone.</u>" (emphasis added)). *See also, e.g.,* Doc. No. 21-16, page 2 ("00:41 Just press the button. 00:42 You'll be connected through your smartphone to a high trained 5Star agent. 00:47 Agents will <u>talk</u> to you <u>through your smartphone.</u>" (emphasis added)). *See also, e.g.,* Doc. No. 21-19, page 6 ("push the button and <u>talk through your smartphone</u> to a highly-trained 5Star Agent who will be there to assist you." (emphasis added)).

**GPS**

"Defendant admits that after communication has been established the Lively Wearable Smartphone Application provides location data, if available, to the Urgent Response Center as a result of a user pressing the Urgent Response Button on the Lively Wearable Device." Defendant's Answer, ¶ 63. Defendant also continuously warns users that the Lively Wearable Smartphone Application makes use of the smartphone's GPS. *See, e.g.,* Doc. No. 21-25, page 4 ("This app may use your location even when it isn't open, which can decrease battery life."). *See also, e.g.,* Doc. No. 21-23, page 3; Doc. No. 21-24, page 5; Doc. No. 21-25, page 3 ("Continued use of GPS running in the background can dramatically decrease

battery life.").  *See also, e.g.,* Doc. No. 21-37, page 4 (wherein Defendant expressly admits that its Smart 2 smartphone has GPS.  Additionally, with respect to Defendant's Touch3, Smart and Smart 2 smartphones, Defendant also explains when its Urgent Response Center tracks the location of a smartphone during an emergency call.  *See* Ex. BW, page 5, lines 17-25.  Thus, the Lively Wearable Smartphone Application works with the phone's GPS to capture location information during a call initiated by the Smartphone and the Lively Wearable Smartphone Application as a result of a user pressing the Urgent Response Button.  *See also, e.g.,* Doc. No. 21-16, page 2, Doc. No. 21-18, page 7, Doc. No. 21-23, pages 3-4, Doc. No. 21-24, pages 4-5 and Doc. No. 21-25, pages 3-4.

## Transmitter

As is evident from the evidence already cited herein, and voluminous other evidence already in the record, the Smartphone (whether Defendant's smartphone or otherwise), to which the Lively Wearable Smartphone Application is downloaded, is a transmitter that transmits captured voice information (the user's voice) and location information (GPS coordinates) during an emergency call to the Urgent Response Center.  Per Defendant, this emergency call is a cellular call transmitted through a cellular network by the activated smartphone.  *See, e.g.,* Ex. BU, page 5, lines 26-28, page 8, lines 1-3 and page 10, lines 3-5.  *See also, e.g.,* Doc. No. 21-37, pages 8-10 (listing charges for Defendant's cellular plans).

### 5.    "voltage differential"

Plaintiff has already informed Defendant that, in view of the Court's construction of "conductive energy device" and "voltage differential", the corresponding claim features of Claims 3 and 9 are "currently asserted to be present under the Doctrine of Equivalents rather than literally present."  *See* the Claim Chart at pages 18 and 28.

Defendant admits that its Smart2 smartphone has a Mediatek MT6738 processor.  Ex. BT, page 41, lines 3, 4 and 16.  Claim 9 recites (emphasis added):

> The self-defense system of claim 1, wherein said defense unit comprises:
>     a conductive energy device comprising two electrodes, said
> conductive energy device configured to generate a voltage differential
> between said electrodes <u>based on</u> said pressure input signal."

While Plaintiff has not found evidence that the MT6738 processor outputs a voltage above 50 kilovolts (and is therefore no longer asserting literal infringement for Claim 9, and similarly Claim 3), Plaintiff has found evidence indicating that this processor outputs a voltage between two (2) electrodes ***based on*** an incoming signal to be processed.  According to the manufacturer of this processor, the MT6738 has four (4) different processing cores (*see* Ex. CH, pages 2-3), and individual processing cores can be shut down and woken up based on processing needs (*see* Ex. CI, pages 3-4).  Thus, when the Lively Wearable Device sends a Bluetooth signal to the Smart 2 smartphone when the Urgent Response Button is pressed, a processing core of the Smart 2 that is in a low-power state can be woken up, and that powered-up core will execute instructions from the Lively Wearable Smartphone Application and output the results of those processing cycles across two of the electrode "pins" of the MT6738 processor.  Thus, Defendant is infringing Claim 9 (and similarly Claim 3) under the Doctrine of Equivalents.

### 6.     "manual selector"

The Court has construed the claim term "manual selector" as a push button that may be recessed.  *See* Doc. No. 35, page 5, lines 3-7.  Each of Defendant's smartphones (e.g., the Touch3, the Smart and the Smart 2) has a "Power/Lock Button".  *See* Doc. No. 21-31, page 8 (wherein Defendant's quick start guide for the <u>Touch3</u> describes the device's "Power/Lock Button" as "allow[ing] you to lock and unlock your phone as well as power it on and off"); Doc. No. 21-34, page 6 (showing the "Power/Lock Button" for the Smart); Doc. No. 21-38, page 4 (showing the "Power/Lock Button" for the Smart2).  Additionally, each of Defendant's smartphones is powered by a battery.  *See* Doc. No. 21-31, page 6.  *See also* Ex. BU, page 6, lines 27-28 and page 9, lines 3-4.  When the smartphone

is off, a user can push the Power/Lock Button in order to turn on or unlock the phone such that the phone's touchscreen will illuminate.  *See* Doc. No. 21-31, page 6; Doc. No. 21-34, page 8; Doc. No. 21-38, page 4.  As such, pushing this Power/Lock Button necessarily causes the phone (which is powered by a battery) to generate an electronic signal that powers up or unlocks the phone, which is apparent from the illumination of the touchscreen.

Dependent Claim 8 recites:

> a manual selector communicatively associated with said defense unit and configured to generate a manual execution signal in response to a selection of said manual selector, said defense unit configured to initiate said defense event based on said manual execution signal.

As previously explained, the Smartphone (referenced in the FAC) and the Lively Wearable Smartphone Application are analogous to the "Defense Unit". Additionally, in view of the foregoing, substantial evidence exists that indicates that the Power/Lock Button of Defendant's smartphone is analogous to the manual selector, and the electronic signal generated to power up or unlock the smartphone such that the touchscreen will illuminate, (and the Lively Wearable Smartphone Application) can be viewed on the touchscreen, is analogous to the manual execution signal.  Therefore, it follows that the defense unit of Defendant's infringing instrumentality is specifically configured to initiate a "defense event" (discussed above with respect to "defense unit") ***based on*** this electronic signal, because the Smartphone and the Lively Wearable Application function, when the Smartphone is powered up and in use, to route captured information to the Urgent Response Center.  *See, e.g.,* Doc. No. 21-16, page 2, Doc. No. 21-18, page 7, Doc. No. 21-23, pages 3-4, Doc. No. 21-24, pages 4-5 and Doc. No. 21-25, pages 3-4. *See also* Defendant's Answer, page 8, ¶ 61.

## IV.   CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment should be denied in its entirety.

Date: <u>December 18, 2019</u>          By:     <u>s/ Jerry A. Crandall</u>

Jerry A. Crandall (CSB No. 250192)
jac@crandalltech.com
CRANDALL TECHNOLOGIES LLC
1590 Heavenly View Trail
Reno, NV 89523

*Attorney for Plaintiff*
*Crandall Technologies LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 18, 2019, the foregoing document and all accompanying attachments were filed with the Clerk of the U.S. District Court for the Southern District of California, using the Court's Electronic Case Filing (ECF) system, in compliance with CivL.R. 5.4. The ECF system serves a "Notice of Electronic Filing" to all parties and counsel who have appeared in this action and who have consented under CivL.R. 5.4 to accept that Notice as service of this document.

Date: <u>December 18, 2019</u>      By:   <u>s/ Jerry A. Crandall</u>

Jerry A. Crandall (CSB No. 250192)
jac@crandalltech.com
CRANDALL TECHNOLOGIES LLC
1590 Heavenly View Trail
Reno, NV 89523

*Attorney for Plaintiff*
*Crandall Technologies LLC*